UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TERRY DUNN, Derivatively on Behalf of DOLLAR GENERAL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>TODD J. VASOS, JEFFERY C. OWEN, JOHN W. GARRATT, KELLY M. DILTS, MICHAEL M. CALBERT, PATRICIA D. FILI-KRUSHEL WARREN F. BRYANT, ANA M. CHADWICK, TIMOTHY I. MCGUIRE, DEBRA A. SANDLER, RALPH E. SANTANA, and WILLIAM C. RHODES, III,<br><br>Defendants,<br><br>-and-<br><br>DOLLAR GENERAL CORPORATION, a Tennessee Corporation,<br><br>Nominal Defendant. | Case No.<br><br>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Terry Dunn, by his attorneys, submits this Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of: (i) public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) news reports, press releases, and shareholder communications; and (iii) other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1. This is a shareholder derivative action brought by plaintiff on behalf of nominal defendant Dollar General Corporation ("Dollar General" or the "Company") against certain of its

officers and directors for breach of fiduciary duty, waste of corporate assets, and unjust enrichment. These wrongs resulted in hundreds of millions of dollars in damages to Dollar General's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed Dollar General to hundreds of millions of dollars in potential liability for violations of state and federal law.

2. Dollar General is a discount retailer that sells a broad selection of merchandise, including consumable products, such as food, paper and cleaning products, health and beauty products, and pet supplies, and nonconsumable products such as seasonal goods, home decor and domestics, and basic apparel. The Company is the largest discount retailer in the United States by number of stores, with 19,726 stores located in forty-eight U.S. states and Mexico as of November 3, 2023. Dollar General's main concentration of stores are in the southern, southwestern, midwestern and eastern United States. The Company's core customers are low- and fixed-income households and items priced at $5 or less generate more than 75% of the Company's sales. As of March 3, 2023, Dollar General had more than 170,000 full-time and part-time employees.

3. Over the last decade, Dollar General has greatly expanded its footprint across rural America. Between 2013 and 2023, the Company increased its store count by more than 84% from 10,662 locations to 19,726 locations. Dollar General found success in small towns often overlooked by other retailers, a strategy that has allowed it to take advantage of lower cost real estate, labor expenses, and reduced retail competition. As part of the Company's business model, Dollar General establishes small "no-frills" stores with low labor costs being a key focal point. Indeed, the Company's stores operate with lean staffing, contributing significantly to its ability to rapidly expand its footprint.

4. However, Dollar General has knowingly limited store labor hours and staff to such an extent that it has placed its employees in situations where the assigned tasks could not possibly be completed within the allotted time. According to the Company's 2022 Annual Report on Form 10-K for the fiscal year ended February 3, 2023 (the "FY22 Form 10-K"),[1] filed with the SEC on March 24, 2023, "[t]he typical Dollar General store is operated by a store manager, one or more assistant store managers, and three or more sales associates." Nevertheless, the reality at most Dollar General stores is that the staff is much leaner. For example, employees at one Dollar General store told *Business Insider* that Dollar General often staffs stores with just a single worker, making it impossible to unpack items, restock shelves, and serve customers at the same time. Another article from the *New York Times*, quoted one of the Company's former "top-performing" managers, who spoke out about the conditions inside one store in Tampa, Florida, before she was fired for her viral TikTok posts. In the article, the former manager of Dollar General stated her job had its challenges: "[d]elivery trucks [] would show up unannounced, leaving boxes piled up in the aisles because there weren't enough workers to unpack them," along with "[d]ays spent running the store for long stretches by herself because the [C]ompany allotted only so many hours for other employees to work."

5. Due to understaffing and the need for employees to both ring up merchandise and stock shelves, employees at the Company's stores have lacked sufficient time to update merchandise pricing or deal with inventory issues as they arose. As a result, the clutter at Dollar General's stores built up. The clutter at the Company's stores was so extensive that merchandise

[1] Dollar General's fiscal year ends on the Friday closest to January 31 of the subsequent calendar year.

often arrived with no place to display it in the store, while other items were regularly lost, broken, or otherwise in unsaleable condition.

6. Employees at the Company's stores had insufficient time or resources to focus on the growing surplus of non-selling inventory, and as new inventory arrived, much of it was being stored in plain sight in plastic tubs or in rolling metal-framed "rolltainer" storage bins parked in and at the ends of aisles. The stockrooms were so full that rolltainers were often rolled directly off the delivery truck and onto the storeroom floor, without merchandise ever being unpacked or displayed for sale properly. These practices resulted in a surplus of merchandise that should have been timely written-off as unsalable. Further, these practices resulted in a disheveled and uninviting shopping environment that dissuaded consumers from shopping at Dollar General.

7. However, the repercussions of Dollar General's understaffed and cluttered stores went much further than poorly managed inventory. The Company's stores have become dangerous for employees and customers, leading to a string of federal workplace safety violations and penalties by the U.S. Department of Labor's Occupational Safety and Health Administration ("OSHA"). Over the past nine years, OSHA has cited the Company 110 times and issued more than $23 million in fines for numerous willful, repeat, and serious workplace safety violations related to unsafe conditions at Dollar General stores nationwide. Most of the safety violations consist of fire hazards such as cluttered aisles, obstructed exits, boxes of merchandise stacked to unsafe heights, blocked electrical panels, sanitation violations, and dimly lit stores. In some cases, merchandise blocked aisles, exits, and access to fire extinguishers, which led to some stores being closed by fire marshals for preventing safe ingress and egress.

8. Dollar General's Board of Directors (the "Board") and the Individual Defendants (as defined herein) have shown a pattern of willful disregard for federal workplace safety

standards. In 2022 alone, Dollar General had fifty-four OSHA violations that amounted to the worst year for safety at the Company's stores. In October 2022, OSHA labeled Dollar General a "severe violator" of federal workplace safety rules and enrolled the Company in the regulator's Severe Violator Enforcement Program ("SVEP"). Due to the Company's flagrant disregard for workplace safety, Dollar General has also faced increased scrutiny from OSHA, the Department of Labor, disgruntled employees, and media outlets like *Business Insider* and *Bloomberg*, among others. The dangerous conditions at the Company's stores and increased scrutiny have driven away consumers and harmed the Company's reputation.

9. In addition to the above and as later confirmed by several adverse regulatory actions, Dollar General also violated various state laws by implementing a campaign of systematically overcharging customers at the register for items that were marked at much lower prices on the shelf (the "overpricing scheme"). Dollar General's overpricing scheme was so pervasive that in response to myriad customer complaints various state Attorneys General have investigated the Company's stores, found pricing errors, and instituted adverse regulatory actions against the Company. For example, in November 2022, Ohio's Attorney General brought a lawsuit against the Company after an audit had "found error rates ranging from 16.7% to 88.2%" in pricing at Dollar General stores located in Ohio. In March 2023, *Barron's* reported that in addition to Ohio, the states of Arizona, Louisiana, Mississippi, and North Carolina had also fined Dollar General for similar pricing irregularities in 2021 and 2022. Similarly, on September 13, 2023, the Missouri Attorney General filed suit alleging that Dollar General was continuing its pattern of "routinely overcharging" and deceiving customers and pled violations of Missouri consumer protection laws. The Individual Defendants' overpricing scheme has also been particularly harmful

to the Company's customers who do their best to make every dollar stretch as far as possible by shopping at discount retailers like Dollar General.

10. Further, from May 28, 2020 to August 30, 2023 (the "Relevant Period"), defendants caused Dollar General to issue false and misleading statements regarding the Company's purportedly effective inventory management and positive financial outlook. Specifically, defendants caused the Company to make improper statements and/or failed to disclose that: (i) Dollar General stores were chronically understaffed and suffering from logistical and inventory management problems which left stores with tens of millions of dollars' worth of outdated and unwanted inventory, mispriced goods, and lost and damaged items; (ii) large backlogs of unsellable merchandise had built up at Dollar General's stores, which inventory had not been timely written down due to understaffing and the Company's failure to manage its inventory; (iii) the allotment of employee hours per store per week imposed by Dollar General's management placed employees in situations where assigned tasks, including those necessary to effectuate store operations, could not be completed within the allotted time; (iv) Dollar General was systematically overcharging customers for items upon checkout above the listed price in violation of state laws; (v) Dollar General's reported revenue and earnings were artificially inflated by defendants' overpricing scheme; (vi) Dollar General's failure to manage store inventories and accurately price items upon checkout risked the loss of customers, lower sales, adverse regulatory actions, and reputational fallout; (vii) Dollar General was not on track to achieve the fourth quarter 2022 ("4Q22") or fiscal year 2023 ("FY23") guidance provided to investors; and (viii) as a result of the foregoing, the Individual Defendants' statements during the Relevant Period about Dollar General's business metrics, operations, and financial prospects were materially false and misleading when made.

11. On February 23, 2023, the truth slowly started to emerge when Dollar General unexpectedly pre-released its preliminary 4Q22 and fiscal year 2022 ("FY22") financial results. In a press release, the Company disclosed that 4Q22 sales and earnings would come in materially below what the Company had led investors to expect as recently as December 2022.

12. On this news, Dollar General's stock declined by 4.89%, or $11.02 per share, on February 24, 2023, to close at $214.25 per share compared to its February 22, 2023 closing of $225.27 per share, erasing over $2.4 billion in market capitalization over two days.

13. On March 16, 2023, Dollar General issued a press release announcing its final 4Q22 and FY22 financial results. For the 4Q22, the Company's net sales rose only 17.9% year-over-year, and for the full year net sales only rose 10.6% year-over-year, missing the Company's prior guidance, which had been updated as recently as December 2022. Acknowledging that the Company had experienced a "decrease in customer traffic," the Company attributed the sales miss to "the impact of store closures." However, Dollar General also finally acknowledged its inventory problems caused by its understaffed and cluttered stores, which had become too problematic to ignore. Specifically, the Company revealed that it would be required to make a one-time "incremental ***investment of approximately $100 million in [its] stores, primarily in incremental labor hours***[.]"

14. On this news, Dollar General's stock declined by 2.96%, or $6.47 per share, on March 16, 2023, to close at $212.09 per share compared to its March 15, 2023 closing of $218.56 per share, erasing over $1.4 billion in market capitalization over one day.

15. Nevertheless, the Company failed to disclose the full truth and instead continued to materially misrepresent Dollar General's business, operations, and financial results. For example, defendants continued to conceal the impact that the cluttered stores and overpricing scheme had

on Dollar General's customers' spending or the need for the Company to take a substantial write-down of its existing inventory. Defendants also failed to disclose the impact of the various regulatory enforcement actions pending against the Company and the reduction in revenue that would necessarily result when customers were no longer being systematically overcharged at the register.

16. On June 1, 2023, Dollar General issued a press release announcing deeply disappointing first quarter 2023 ("1Q23") results, revealing 1Q23 revenue $130 million below analyst estimates and slashing the Company's FY23 earnings forecast provided in March 2023. On the same day, during a related earnings call, defendant Jeffrey C. Owen ("Owen"), the Company's former Chief Executive Officer ("CEO") conceded that "[w]ith our previously announced investment in incremental store labor hours, we continue to enhance the customer experience, including a material improvement in customer satisfaction scores since prior year-end." Thus, finally partially acknowledging the extent to which Dollar General stores had fallen into disarray.

17. The market reacted negatively and on this news, Dollar General's market capitalization plunged nearly 20% over one trading day, from its closing price of $201.09 per share on May 31, 2023, to close at $161.86 per share on June 1, 2023, a decline of $39.23 per share, erasing over $8.6 billion in market capitalization.

18. Nevertheless, once again defendants failed to disclose the full truth regarding Dollar General's business, operations, and financial results. On August 31, 2023, Dollar General issued a press release announcing its second quarter 2023 ("2Q23") financial results, again slashing its FY23 sales and profit outlook. This time, the Company blamed a "headwind," including weaker consumer spending on nonessential purchases and increasing theft. In the press release, defendant

Owen stated: "While we are not satisfied with our overall financial results, we made significant progress in the second quarter improving execution in our supply chain and our stores, as well as reducing our inventory growth rate and further strengthening our price position." The press release further conceded that the Company was "taking certain actions to accelerate the pace of its inventory reduction efforts and making additional investments in targeted areas, such as retail labor, to further elevate the in-store experience and better serve its customers," and "expect[ed] an incremental operating profit headwind of up to $170 million in the second half of 2023 from these strategic actions and investments." Of that, $95 million would be for markdowns taken on the Company's existing inventory. And another $75 million would be spent on increased personnel at the stores to both identify and eliminate the inventory to be marked down and to correctly price the items remaining on store shelves.

19. On the same day, defendant Owen acknowledged during Dollar General's earnings conference call with analysts and investors that the Company was deploying "smart teams," to move between multiple stores to organize excess inventory and clean up its stores. The Company deployed one team in each of its districts in the United States. On the same day, *Business Insider* reported that one former Dollar General employee who worked on a smart team stated the job involved taking unpacked inventory off of rolltainers and "basically [involved] doing a whole-store revamp."

20. On this news, Dollar General's market capitalization plunged 12% over one trading day, from its closing price of $157.66 per share on August 30, 2023, to close at $138.50 per share on August 31, 2023, a decline of $19.16 per share, erasing over $4.2 billion in market capitalization.

21. The Insider Selling Defendants (as defined herein), however, have not fared nearly as bad. Taking advantage of the artificial inflation caused by the unlawful activity detailed herein, these insiders reaped nearly $320 million from their sales of Company stock at artificially inflated prices.

22. As a direct result of this unlawful course of conduct, Dollar General is now the subject of a federal securities fraud class action lawsuit filed in the U.S. District Court for the Middle District of Tennessee on behalf of investors who purchased Dollar General's shares, captioned *Washtenaw County Employees' Retirement System v. Dollar General Corp., et al.*, No. 3:23-cv-01250 (M.D. Tenn.) (the "Securities Class Action").

23. Dollar General's Board has not, and will not, commence litigation against the Individual Defendants named in this Complaint, nor will they vigorously prosecute such claims. Specifically, the Board will not prosecute such claims because they face a substantial likelihood of liability to Dollar General for failing to comply with all applicable laws and regulations, for authorizing or failing to correct the improper statements alleged herein, and for failing to correct and/or implement the necessary internal controls to prevent the harm to the Company that has occurred. Accordingly, a pre-suit demand upon the Board is a useless and futile act. Thus, plaintiff rightfully brings this action to vindicate Dollar General's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to Dollar General.

## JURISDICTION AND VENUE

24. Jurisdiction is conferred by 28 U.S.C. §1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

25. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District,

or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

26. Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Dollar General maintains its principal executive offices in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Dollar General, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

27. Plaintiff Terry Dunn was a shareholder of Dollar General at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Dollar General shareholder. Plaintiff is a citizen of Georgia.

**Nominal Defendant**

28. Nominal defendant Dollar General is a Tennessee corporation with principal executive offices located at 100 Mission Ridge, Goodlettsville, Tennessee. Accordingly Dollar General is a citizen of Tennessee. Dollar General is the largest discount retailer in the United States by number of stores, with 19,726 stores located in forty-eight U.S. states and Mexico as of November 3, 2023, with the greatest concentration of stores in the southern, southwestern, midwestern, and eastern United States. Dollar General stores offer a broad selection of

merchandise, including consumable products such as food, paper and cleaning products, health and beauty products, and pet supplies, and nonconsumable products such as seasonal goods, home decor and domestics, and basic apparel. Dollar General's merchandise includes national brands from leading manufacturers, as well as private brand selections, with prices at substantial discounts to national brands, which the Company offers at everyday low prices, typically $10 or less. The Company's common stock trades on the New York Stock Exchange under the ticker symbol "DG." As of March 3, 2023, Dollar General had more than 170,000 full-time and part-time employees.

**Defendants**

29. Defendant Todd J. Vasos ("Vasos") is Dollar General's CEO and has been since October 2023, and a director and has been since June 2015. Defendant Vasos was also Dollar General's CEO from June 2015 to November 2022; a Senior Retail Business Consultant to Dollar General from April 2021 to October 2023; a Senior Business Advisor from November 2022 to April 2023; Chief Operating Officer from November 2013 to June 2015; and Executive Vice President, Division President and Chief Marketing Officer from December 2008 to November 2013. Defendant Vasos is named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, promulgated thereunder. While in possession of material, nonpublic information concerning Dollar General's true business health, defendant Vasos sold 1,322,681 shares of his personally held Company stock for $283,571,252.76 in proceeds. Dollar General paid defendant Vasos the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2022 | $1,391,720 | $5,592,354 | $5,924,983 | $2,520,000 | $192,349 | $15,621,406 |
| 2021 | $1,350,052 | $5,179,592 | $5,239,005 | $4,544,529 | $305,695 | $16,618,873 |
| 2020 | $1,341,718 | $4,403,178 | $4,544,937 | $6,075,000 | $87,990 | $16,452,823 |

Defendant Vasos is a citizen of Tennessee.

30. Defendant Owen was Dollar General's CEO and a director from November 2022 to October 2023; Chief Operating Officer from August 2019 to November 2022; Executive Vice President of Store Operations from June 2015 to August 2019; Senior Vice President, Store Operations from August 2011 to July 2014; Vice President, Division Manager from March 2007 to July 2011; Retail Division Manager from November 2006 to March 2007; and held various other operations positions of increasing responsibility from December 1992 to November 2006. Defendant Owen is named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5, promulgated thereunder. Dollar General paid defendant Owen the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2022 | $962,310 | $1,579,023 | $8,050,200 | $1,344,299 | $96,852 | $12,032,684 |
| 2021 | $845,241 | $1,072,461 | $1,084,805 | $1,904,528 | $68,659 | $4,975,694 |
| 2020 | $823,405 | $1,076,301 | $1,110,990 | $2,484,144 | $64,017 | $5,558,857 |

Defendant Owen is a citizen of Tennessee.

31. Defendant John W. Garratt ("Garratt") was Dollar General's President from September 2022 to May 2023; Chief Financial Officer ("CFO") from December 2015 to May 2023; Executive Vice President from December 2015 to September 2022; Interim CFO from July 2015 to December 2015; and Senior Vice President, Finance & Strategy from October 2014 to July 2015. Defendant Garratt is named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5, promulgated thereunder. While in possession of material, nonpublic information concerning Dollar General's true business health, defendant Garratt sold 174,674 shares of his personally held Company stock

for $34,981,524.67 in proceeds. Dollar General paid defendant Garratt the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2022 | $852,150 | $1,052,610 | $1,438,947 | $884,766 | $74,963 | $4,303,436 |
| 2021 | $794,061 | $828,781 | $838,227 | $1,344,028 | $67,261 | $3,872,358 |
| 2020 | $767,284 | $782,849 | $807,990 | $1,736,125 | $63,620 | $4,157,868 |

Defendant Garratt is a citizen of Tennessee.

32. Defendant Kelly M. Dilts ("Dilts") is Dollar General's Executive Vice President and CFO and has been since May 2023. Defendant Dilts was also Dollar General's Senior Vice President of Finance from July 2019 to May 2023. Defendant Dilts is named as a defendant in the Securities Class Action that alleges she violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5, promulgated thereunder. Defendant Dilts is a citizen of Tennessee.

33. Defendant Michael M. Calbert ("Calbert") has been Dollar General's Chairman of the Board since January 2016 and a director since July 2007. Dollar General paid defendant Calbert the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2022 | $112,500 | $326,310 | $19,079 | $457,889 |
| 2021 | $112,500 | $336,279 | $2,972 | $451,751 |
| 2020 | $112,500 | $377,216 | $3,330 | $493,046 |

Defendant Calbert is a citizen of California.

34. Defendant Patricia D. Fili-Krushel ("Fili-Krushel") is a Dollar General director and has been since October 2012. Defendant Fili-Krushel has been the Chair and a member of Dollar General's Compensation and Human Capital Management Committee since at least April 2020. While in possession of material, nonpublic information concerning Dollar General's true business health, defendant Fili-Krushel sold 6,165 shares of her personally held Company stock for

$1,366,744.90 in proceeds. Dollar General paid defendant Fili-Krushel the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2022 | $115,000 | $142,848 | $1,635 | $259,483 |
| 2021 | $115,000 | $154,323 | $1,381 | $270,704 |
| 2020 | $115,000 | $178,027 | $1,471 | $294,498 |

Defendant Fili-Krushel is a citizen of New York.

35. Defendant Warren F. Bryant ("Bryant") is a Dollar General director and has been since November 2009. Defendant Bryant has been a member of Dollar General's Audit Committee since at least April 2020, and also a member of the Compensation and Human Capital Management Committee since at least April 2020. Dollar General paid defendant Bryant the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2022 | $95,000 | $142,848 | $1,635 | $239,483 |
| 2021 | $95,000 | $154,323 | $1,381 | $250,704 |
| 2020 | $95,000 | $178,027 | $1,471 | $274,498 |

Defendant Bryant is a citizen of Arizona.

36. Defendant Ana M. Chadwick ("Chadwick") is a Dollar General director and has been since July 2022. Defendant Chadwick has been Chair of Dollar General's Audit Committee since May 2023, and a member of that committee since July 2022. Dollar General paid defendant Chadwick the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2022 | $47,500 | $174,063 | $774 | $222,337 |

Defendant Chadwick is a citizen of Connecticut.

37. Defendant Timothy I. McGuire ("McGuire") is a Dollar General director and has been since February 2018. Defendant McGuire has been a member of Dollar General's

Compensation and Human Capital Management Committee since at least April 2020. Dollar General paid defendant McGuire the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2022 | $95,000 | $142,848 | $1,635 | $239,483 |
| 2021 | $95,000 | $154,323 | $1,381 | $250,704 |
| 2020 | $95,000 | $178,027 | $1,471 | $274,498 |

Defendant McGuire is a citizen of Canada.

38. Defendant Debra A. Sandler ("Sandler") is a Dollar General director and has been since April 2020. Defendant Sandler has been a member of Dollar General's Audit Committee since at least April 2021. Dollar General paid defendant Sandler the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2022 | $95,000 | $142,848 | $1,635 | $239,483 |
| 2021 | $95,000 | $154,323 | $1,381 | $250,704 |
| 2020 | $79,341 | $178,027 | $1,029 | $258,397 |

Defendant Sandler is a citizen of New Jersey.

39. Defendant Ralph E. Santana ("Santana") is a Dollar General director and has been since February 2018. Dollar General paid defendant Santana the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2022 | $95,000 | $142,848 | $1,635 | $239,483 |
| 2021 | $95,000 | $154,323 | $1,381 | $250,704 |
| 2020 | $95,000 | $178,027 | $1,471 | $274,498 |

Defendant Santana is a citizen of Massachusetts.

40. Defendant William C. Rhodes, III ("Rhodes") was a Dollar General director from November 2009 to May 2023. Defendant Rhodes was Chair and a member of Dollar General's

Audit Committee from at least April 2020 to May 2023. Dollar General paid defendant Rhodes the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2022 | $120,000 | $142,848 | $1,635 | $264,483 |
| 2021 | $120,000 | $154,323 | $1,381 | $275,704 |
| 2020 | $120,000 | $178,027 | $1,471 | $299,498 |

Defendant Rhodes is a citizen of Tennessee.

41. The defendants identified in ¶¶29-32 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶29-30, 33-40 are referred to herein as the "Director Defendants." The defendants identified in ¶¶35-36, 38, 40 are referred to herein as the "Audit Committee Defendants." The defendants identified in ¶¶29, 31, 34 are referred to herein as the "Insider Selling Defendants." Collectively, the defendants identified in ¶¶29-40 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### Fiduciary Duties

42. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Dollar General and its shareholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Dollar General in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Dollar General and not in furtherance of their personal interest or benefit.

43. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Dollar General, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive,

managerial, and directorial positions with Dollar General, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company.

44. To discharge their duties, the officers and directors of Dollar General were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Dollar General were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b) ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(c) conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d) refrain from engaging in acts of self-dealing to enrich themselves at the expense of the Company and its investors;

(e) remain informed as to how Dollar General conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(f) truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Duties Pursuant to the Company's Code of Business Conduct and Ethics**

45. The Individual Defendants, as officers and/or directors of Dollar General, were also bound by the Company's Code of Business Conduct and Ethics (the "Code") which, according to the Code, sets out basic principles to guide all directors, officers, and employees of Dollar General, who are required to know and conduct themselves in accordance with the Code, as well as all applicable laws and regulations, and to avoid the appearance of improper behavior.

46. With respect to the accuracy of financial records and public disclosures titled, "Ensuring Accuracy of Records and Public Disclosures," the Code provides:

> Our Company's SEC filings and other public communications must contain full, fair, accurate, timely and understandable information, without fail. To fulfill this obligation, we must comply with generally accepted accounting principles and our internal controls policies and procedures. We also must ensure Dollar General's books and records are accurate, complete and truthful at all times. This means any business records we submit—such as expense reports, time records and contract documentation—must be timely, complete and honest, and we may never maintain "off the books" accounts or make false or misleading entries. If you become aware of a potential problem with our Company's accounting or public disclosures, raise your concern with our Chief Accounting Officer or CFO immediately.

47. In addition, with respect to insider trading titled, "Obeying Insider Trading Laws," in relevant part, the Code provides:

> At times, we may have access to information about Dollar General or a business partner that is not available to the general public. When we hold such inside information, it is illegal to buy or sell that company's stock or other securities.
>
> * * *
>
> Insider trading violates not only our Code, but also U.S. securities laws. Anyone who engages in insider trading is subject to disciplinary action and potential criminal prosecution. To help reduce the risk of a violation, <u>the Company has established trading windows and preclearance requirements that are applicable to</u>

certain employees. You have been or will be notified if you are subject to such requirements.

**Additional Duties of the Audit Committee Defendants**

48. Under the Audit Committee's Charter, the Audit Committee Defendants, defendants Bryant, Chadwick, Sandler, and Rhodes, owed and owe specific duties to Dollar General to assist the Board in overseeing: "the integrity of the Company's financial statements," and "the Company's compliance with legal and regulatory requirements." In addition, under the "Ethical and Legal Compliance" section, the Audit Committee's Charter provides that its members must "[r]eceive reports on the activities of the Company's Compliance Committee and on the content, operation and effectiveness of the legal compliance program."

**Control, Access, and Authority**

49. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Dollar General, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Dollar General.

50. Because of their advisory, executive, managerial, and directorial positions with Dollar General, each of the Individual Defendants had access to adverse, nonpublic information about the financial condition, operations, and improper representations of Dollar General.

51. At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of Dollar General, and was at all times acting within the course and scope of such agency.

**Breaches of Duties**

52. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Dollar General, the absence

of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

53. The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to understaff its stores and thereby suffer from inventory management problems, implement an overpricing scheme, and disseminate improper statements to the public. These improper practices wasted the Company's assets, and caused Dollar General to incur substantial damage.

54. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Dollar General, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has already incurred, Dollar General has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

55. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

56. During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of Dollar General, regarding the Individual Defendants'

management of Dollar General's operations including the Company's failure to sufficiently staff, ensure safe working conditions at its stores, and accurately price items upon checkout in violation of state and federal laws; (ii) conceal harmful information relating to Dollar General's business practices, operations, financials, financial prospects, and lack of disclosure controls and procedures that rendered statements in the Company's SEC filings and public disclosures improper; (iii) facilitate the Insider Selling Defendants' illicit sale of over $319 million worth of their personally held Company shares while in possession of material, nonpublic information; and (iv) enhance the Individual Defendants' executive and directorial positions at Dollar General and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

57. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's understaffed and unsafe stores that were suffering from inventory management problems, and systematically overcharging Dollar General's customers at checkout above the listed retail price in violation of state laws.

58. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly fail to remedy unsafe working conditions at Dollar General's stores, implement an unlawful overpricing scheme that inflated the Company's financials, and deceive investors through a series of false statements in the Company's SEC filings and public disclosures. Because the actions described

herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

59. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### Background on the Company

60. Dollar General is a discount retailer that sells a broad selection of everyday items including food, drinks, basic apparel, housewares, health and beauty products, and cleaning and laundry supplies. Dollar General is the largest discount retailer in the United States by number of stores, with 19,726 stores located in forty-eight U.S. states and Mexico as of November 3, 2023. The majority of Dollar General's stores are concentrated in the southern, southwestern, midwestern, and eastern United States. The Company's core customers are low- and fixed-income households, and items priced at $5 or less generate more than 75% of the Company's sales. Dollar General claims that it "lives its mission of *Serving Others* every day by providing access to affordable products and services for its customers, career opportunities for its employees, and literacy and education support for its hometown communities." As of March 3, 2023, Dollar General employed more than 170,000 full-time and part-time employees.

61. Despite its name, Dollar General stores are not the prototypical "dollar store" that sells nearly all of its products for a dollar. Instead, the Company sells products at 20% to 40% less

than drug and grocery stores and keeps most of its prices below $10. The Company's merchandise includes national brands from leading manufacturers, as well as the Company's own private brand selections.

**Dollar General Greatly Expands Its Footprint**

62. The Company's core customer base are individuals with modest income. It focuses on selling low-cost goods and opening stores in areas without numerous retailers. In particular, the Company has found success in small towns overlooked by most other retailers, a strategy that has allowed it to take advantage of lower-cost real estate and labor expenses, and reduced retail competition. In fact, approximately 75% of the Company's stores are located in communities of 20,000 or fewer people. This focus has allowed Dollar General to continue to expand its stores, distribution centers, and sales despite consumers shifting to online retail sales, which has adversely impacted many of its brick-and-mortar peers. Between 2013 and 2023, the Company increased its store count by more than 84% from 10,662 locations to 19,726 locations.

**Dollar General Stores Are Understaffed and Unsafe**

63. As part of the Company's business model, Dollar General establishes small "no-frills" stores with low labor costs being a key focal point. According to the Company's 2022 Form 10-K, "[t]he typical Dollar General store is operated by a store manager, one or more assistant store managers, and three or more sales associates." Indeed, the lean store staffing is one of the reasons the Company has been able to expand its footprint at such a rapid rate.

64. However, Dollar General has knowingly limited store labor hours and staff to such an extent that it has placed its employees in situations where the assigned tasks could not possibly be completed within the allotted time. For example, employees have told *Business Insider*, that Dollar General often staffs stores with just a single worker, making it impossible to unpack items, restock shelves, and serve customers at the same time. Another article from the *New York Times*,

on April 18, 2022, quoted one of the Company's former "top-performing" managers, who spoke out about the conditions inside one store in Tampa, Florida, before she was fired for her viral TikTok posts. In the article, the former manager of Dollar General stated her job had its challenges: "[d]elivery trucks [] would show up announced, leaving boxes piled up in the aisles because there weren't enough workers to unpack them," along with "[d]ays spent running the store for long stretches by herself because the company allotted only so many hours for other employees to work." Further, the former manager stated:

> The store used to have about 198 hours a week to allocate to a staff of about seven people.... But by the end of last month [March 2022], she had only about 130 hours to allocate, which equated to one full-time employee and one part-time employee fewer than when she started.
>
> With not as many hours to give to her staff, [she] often had to operate the store on her own for long stretches, typically working six days and up to 60 hours a week with no overtime pay.

65. In addition, due to understaffing, and the need for employees to both ring up merchandise and stock shelves, employees have lacked sufficient time to update merchandise pricing or deal with inventory issues as they arose. As a result, the clutter built up on the Company's store shelves. The clutter at the Company's stores was so extensive that merchandise often arrived at the Company's stores with no place to display it, while other items were regularly lost, broken, or otherwise in unsaleable condition. The items that were not selling at Dollar General steadily piled up.

66. In addition, since employees had insufficient time or resources to focus on the growing surplus of non-selling inventory, as new inventory arrived, much of it was being stored in plain sight in plastic tubs or in rolling metal-framed rolltainer storage bins parked in and at the ends of aisles. As the rolltainers were unloaded off the delivery truck, they were parked in the aisles without the merchandise ever being unpacked or displayed for sale properly. These practices

resulted in a surplus of merchandise that should have been timely written-off as unsaleable. Further, these practices resulted in a disheveled and uninviting shopping environment that dissuaded consumers from shopping at Dollar General.

67. In some cases, the merchandise blocked aisles, exits, and access to fire extinguishers. The Company's stores became so crowded with disorganized merchandise that some stores were closed by fire marshals for being dangerously over-packed and preventing safe ingress and egress. For example, inspections at two stores in Virginia found that inventory was blocking exits and cluttered aisles lacked the minimum clearance of at least thirty-six inches of space for customers and employees to get through. In addition, a fire department in Minneapolis also found excessive amounts of overstock items in the aisles and in the stockroom, and ordered the store to close. Unfortunately, as explained in more detail below, defendants failed to remediate the known logistical problems and other operational difficulties leading to the buildup of unwanted inventory and the destruction and loss of tens of millions of dollars' worth of store merchandise.

68. The impact of Dollar General's cluttered and unsafe stores came to a head, on March 16, 2023, when Dollar General reported deeply disappointing financial results. In its press release, the Company revealed that it would be required to make a one-time "incremental ***investment of approximately $100 million in our stores, primarily in incremental labor hours***, as we look to build on our sales momentum and capture additional market share by further enhancing store standards and the in-store experience."

69. A shareholder proposal, requesting an independent audit of the Company's safety policies, was included in the Company's most recent Proxy Statement on Schedule 14A filed with the SEC on April 11, 2023. Specifically, the proposal stated:

> Since 2017, Dollar General has received $12.3 million in Occupational Safety and Health Administration (OSHA) penalties for numerous willful, repeated, and

> serious workplace safety violations. OSHA designated Dollar General as a "severe violator" in 2022, issuing citations for blocked safety exits and unsafe storage areas, inaccessible fire extinguishers, storage of boxes in front of electrical panels, exposure of workers to electrocution risks, and failure to provide exit signs and required stair handrails. Regulators and employment experts state that the company "choos[es] to place profits over their employees' safety and well-being" and that its business model leads to disregarding the law and "cutting corners when it comes to basis worker safety.
>
> As supply chain disruptions, increasing freight costs, and shipping delays impact dollar stores nationwide, it is not evident that there are adequate systems in place to address these dynamics and mitigate potential impacts on workers. ***Staffing levels appear to be insufficient to manage the workload, especially as it relates to unpredictable shipments and influxes of inventory, which may lead to blocked exits or increased fire hazards***. Staffing shortages and high turnover contribute to fatigue, high workload, and further exacerbate safety issues. This may also contribute to loss of new store development opportunities or poor worker retention. In the midst of high economic inequality, Dollar General employees are among the most vulnerable workers, with 92 percent of Dollar General's hourly workers making less than $15 per hour.

Notably, the Board opposed the proposal, arguing, among other things, that its safety program was sufficient and that "[h]undreds of safety checks and audits occur each day across our network."

70. Nevertheless, on May 31, 2023, the Company's shareholders approved the resolution for the independent audit, which should evaluate "management and business practices that contribute to an unsafe or violent environment." Similarly, during the Company's shareholder/analyst conference call held on the same day, a Dollar General employee reiterated some of the same concerns regarding safety. Specifically, the employee stated:

> We urge Dollar General to commit to an independent audit and meet directly with workers to hear our demands and to take steps to make their stores a safe place to go to work. ... Even if you don't personally have [to worry] about the hazards, my coworkers and I deal with. If you have a financial stake in Dollar General, this should concern you.
>
> Just last week, the U.S. Department of Labor announced $3.4 million in new penalties at the 9 ... inspections across 4 states....
>
> This is all made worse by the serious level of understaffing. It is not uncommon for a worker to be alone in the store at night in areas where robberies commonly

occur. As a result, at least 49 people have been killed, and 172 injured in Dollar General from gun violence since 2014.

71. The next day, on June 1, 2023, *CNN Business* reported that "[t]he vote to audit the [C]ompany's practices was a rebuke to Dollar General's leadership and a sign of growing pressure on the fast-growing retailer to improve workplace safety."

72. However, the inventory management problems at Dollar General's stores were so extensive that the Company was forced to take aggressive remedial action. Specifically, on August 31, 2023, defendant Owen stated on the Company's earnings conference call that in order to clean up its stores, Dollar General deployed "smart teams" to move between multiple stores to organize excess inventory. The Company deployed one team in each of its districts in the United States.

73. Also on August 31, 2023, *Business Insider* reported that "[o]ne former Dollar General employee who worked on a smart team in Texas told Insider that the job involves taking unpacked inventory off of rolltainers, or metal carts that hold boxes of merchandise and have become a common sight at the ends of aisles at many Dollar General stores," noting that the "employee's smart team was usually sent to stores right before they underwent an annual inventory review." Further, according to the former employee, "[i]t was basically doing a whole-store revamp," because "[w]e'd throw all the penny stuff away, the employee said, referring to Dollar General items that have been marked down to one cent each in the store's inventory and have become targets for bargain hunters." Further, according to another *Business Insider* report, the Company had taken to marking items down to $0.01 when it intended to throw them out, but with no employee resources available to cull the shelves for the penny inventory, the merchandise simply remained on store shelves.

**Dollar General's Unsafe Stores Continuously Violate OSHA Standards**

74. The U.S. Department of Labor's OSHA sets and enforces standards to ensure safe and healthy working conditions for workers. OSHA enforces compliance with worker safety regulations by identifying, citing, and penalizing employers for their violations. Under OSHA standards there are several types of violations which include "willful" violations in which the employer either knowingly failed to comply with a legal requirement or acted with plain indifference to employee safety. In addition, there are "serious" violations which exist when the workplace hazard could cause an accident or illness that would most likely result in death or serious physical harm, and "repeated" violations in which the agency has been previously cited for the same or a substantially similar condition.

75. Due to Dollar General's understaffed, cluttered, and unsafe stores, over the past nine years, the Company has subjected hundreds of thousands of its employees to increased safety risks and become one of OSHA's top violators. Since 2014, OSHA has issued more than $23 million in fines and cited Dollar General and its subsidiary, Dolgencorp LLC, for numerous ***willful, repeat, and serious*** workplace safety violations related to unsafe conditions at stores nationwide. Most of the safety violations consist of, among other things, fire hazards such as cluttered aisles, obstructed exits, boxes of merchandise stacked to unsafe heights, blocked electrical panels, sanitation violations, and dimly lit stores.

76. In October 2022, Dollar General was added to OSHA's "severe violators" list, following a decision by the federal regulator to cite four Dollar General stores in the Southeast for more than a dozen violations that carried a proposed fine of $1.68 million. As an employer on the severe violators list, Dollar General is now subject to the SVEP, which allows OSHA officials to inspect stores at random, without a direct complaint about working conditions.

77. Due to the numerous OSHA violations, the Company has faced increased scrutiny from OSHA, the Department of Labor, disgruntled employees, and media outlets such as *Business Insider* and *Bloomberg*, among others. The dangerous working conditions and increased scrutiny have continued to harm the Company's reputation.

78. For example, according to OSHA Regional Administrator Kurt Petermeyer, "Dollar General's growing record of disregard for safety measures makes it abundantly clear that the company puts profit before people," adding that "[t]hese violations are preventable, and failing to prevent them shows a blatant disregard for the workers on whom they depend to keep their stores operating. OSHA continues to make every effort to hold Dollar General accountable for its failures."

79. OSHA has also cited Dollar General for safety violations that required immediate medical treatment for its employees. For instance, at a store in Minot, North Dakota, federal inspectors found that some employees needed medical treatment after a chemical tank burst. OSHA said that Dollar General had not given the employees training and personal protective equipment to clean up the chemicals. These were just some of the thirty-two violations that OSHA found at Dollar General stores in North Dakota in 2022. The fines for those violations totaled $2.5 million.

80. The Individual Defendants have shown a pattern of willful disregard for federal workplace safety standards. For example, in the past nine years, Dollar General stores have been cited and penalized by OSHA for numerous willful, repeat, and serious workplace safety violations. Specifically, from November 13, 2014 and spanning until May 31, 2023, OSHA has fined Dollar General 110 times for a total of over $23 million. *See* List of OSHA Fines of Dollar General from the Period of November 13, 2014 to May 31, 2023, attached hereto as Exhibit A.

Over that time, 2022 was Dollar General's worst year for safety at its stores, as it had fifty-four violations in 2022 alone.

**Defendants Unlawful Overpricing Scheme**

81. Violating federal workplace safety regulations was not the only unlawful conduct that Dollar General ignored. Dollar General also violated state laws by implementing a campaign of systematically overcharging customers at the register for items that were marked at much lower prices on the shelf. After myriad customer complaints regarding pricing errors at Dollar General stores, various state Attorneys General have started several investigations and adverse regulatory actions against the Company.

82. Most notably, in November 2022, Ohio's Attorney General brought a lawsuit against the Company after an audit had "found error rates ranging from 16.7% to 88.2%" in pricing at Dollar General stores located in Ohio. In January 2023, the Ohio Attorney General found that Dollar General had continued its overpricing scheme despite the lawsuit, which resulted in the Ohio Attorney General seeking an order enjoining Dollar General from continuing to violate state law. In order to avert the Ohio Attorney General's motion, in January 2023, Dollar General shut down all stores in Ohio for a day to self-audit its pricing practices. In February 2023, Dollar General agreed to ostensibly correct all prices at the register and to cease its overpricing scheme. Nevertheless, in October 2023, Dollar General reached a $1 million settlement with the state of Ohio, and under the settlement agreed to pay $750,000 to the office of Ohio Attorney General Dave Yost, while the remaining $250,000 will cover a penalty and investigative costs.

83. In March 2023, *Barron's* issued an article titled, "When the Price Isn't Right: Dollar General's Record of Overcharging." The article discussed defendants' overpricing scheme and noted that, in addition to Ohio, the states of Arizona, Louisiana, Mississippi, and North Carolina had also fined Dollar General for similar pricing irregularities in 2021 and 2022.

84. However, despite Dollar General's purported agreement to cease its overpricing scheme, certain of the Company's stores were still overcharging customers. Specifically, on September 13, 2023, the Missouri Attorney General filed suit alleging that Dollar General was continuing its pattern of "routinely overcharging" and deceiving customers. The suit claimed that hundreds of the Company's stores in Missouri are offering "unfair and deceptive pricing," in violation of Missouri's consumer protection laws. According to the Missouri Attorney General's complaint, a majority, or "92 of the 147 [Dollar General] locations where investigations were conducted failed inspection ... with an average overcharge of $2.71 for the over 5,000 items price checked by investigators." The Missouri Attorney General pled violations of the Missouri Merchandising Practices Act and sought injunctive relief, penalties of up to $1,000 per violation, restitution, and "[d]isgorgement of Defendant's ill-gotten gains acquired in connection with its unlawful practices."

**IMPROPER STATEMENTS**

85. The defendants made a series of false and misleading statements regarding the Company's purportedly effective inventory management and positive financial outlook that failed to inform investors about the impact that Dollar General's cluttered stores and overpricing scheme would have on the Company's financial position once discovered. As a result, the Company's stock price traded at artificially inflated levels during the Relevant Period.

86. In particular, on May 28, 2020, Dollar General issued a press release announcing its first quarter 2020 ("1Q20") financial results. The press release stated that net sales increased 27.6%, same-store sales increased 21.7%, and operating profit increased 69.2%, while diluted earnings per share ("EPS") increased 73% to $2.56. The press release also highlighted that "[g]ross profit as a percentage of net sales was 30.7% in the first quarter of 2020 ... an increase of 49 basis

points," and that "[t]his gross profit rate increase was primarily attributable to a reduction in markdowns as a percentage of net sales and higher initial markups on inventory purchases."

87. On the same day, defendants Vasos, Garratt, and Owen led the Company's earnings conference call with analysts and investors to discuss the 1Q20 financial results. During the Question & Answer portion of the conference call, defendant Owen, then serving as the Company's Chief Operating Officer, lauded the Company's strong store merchandizing and stocking capabilities, stating:

> I'm extremely proud of the way the team responded to the in-stock challenges that all retailers faced. And our merchant team was involved very, very early with our suppliers in partnering with ways to get our fair share of product, but also thinking about creative ways to provide alternative pack sizes or substitute items for our stores. And then also, we were able to stand up even new SKUs during this period of time. ***So [the] merchant team did an outstanding job and then the supply chain, obviously, you can't do that without the supply chain. So they were able to flex up to our demand. And then also, they're able to deliver the product to our stores on time. And then finally, as Todd mentioned as well, Fast Track earlier is – was one of our initiatives that really paid off during this because the stores were able to get the product on the shelf.***
>
> As I think out and when it will end, a lot of that depends on the customer. And it also depends on the way the economy in terms of the shelter in place. So as you know, many of the nation is opened up for business now, so we'll have to wait and see. ***But I can tell you this, our supply chain is ready to deliver the product to the stores when it's available, and our store teams are ready to get it on the shelf. So we'll be in a great position for the customer once the products are available.***

88. Also on May 28, 2020, Dollar General filed its Quarterly Report on Form 10Q for the 1Q20 ended May 1, 2020 (the "1Q20 Form 10-Q") with the SEC, which was signed by defendant Garratt and certified pursuant to the Sarbanes Oxley Act of 2002 ("SOX") by defendants Vasos and Garratt. The 1Q20 Form 10-Q provided the same financial results reported in the 1Q20 press release and stated that "[g]ross profit, as a percentage of net sales, was 30.7% in the 2020 period ... an increase of 49 basis points, primarily reflecting favorable markdowns and higher initial inventory markups." Further, the 1Q20 Form 10-Q discussed Dollar General's purported

"effective[] manage[ment]" of its inventory, and stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

89. On August 27, 2020, Dollar General issued a press release announcing its second quarter 2020 ("2Q20") financial results. The press release reported net sales increased 24.4%, same-store sales increased 18.8%, and operating profit increased 80.5%, while diluted EPS increased 89.1% to $3.12. The press release also emphasized that "[g]ross profit as a percentage of net sales was 32.5% in the second quarter of 2020 ... an increase of 167 basis points," and noted that "[t]his gross profit rate increase was attributable to higher initial markups on inventory purchases ... and a reduction in markdowns as a percentage of net sales."

90. On the same day, Dollar General held an earnings conference call with analysts and investors to discuss the Company's 2Q20 results, led by defendants Vasos, Garratt, and Owen. During his opening remarks, defendant Owen stated that "[a]s a result of our efforts to date, our store associates are able to better serve our customers during this period of heightened demand." Later during the call, defendant Vasos similarly stated:

> Moving now to Fast Track, where our goals include increasing labor productivity in our stores, enhancing customer convenience and further improving on shelf availability. We continue to be pleased with the labor productivity investments we are seeing as a result of our efforts around rolltainer optimization and even more shelf-ready packaging.

91. Also on August 27, 2020, Dollar General filed its Quarterly Report on Form 10-Q for the 2Q20 ended July 31, 2020 (the "2Q20 Form 10-Q") with the SEC, which was signed by defendant Garratt and certified pursuant to SOX by defendants Vasos and Garratt. The 2Q20 Form 10-Q provided the same financial results reported in the 2Q20 press release and stated that "[g]ross profit, as a percentage of net sales, was 32.5% in the 2020 period ... an increase of 167 basis points, primarily reflecting higher initial inventory markups, a significant increase in sales of non-

consumable products, and favorable markdowns." In discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the 2Q20 Form 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

92. On December 3, 2020, Dollar General issued a press release announcing its third quarter 2020 ("3Q20") financial results. The press release stated that net sales increased 17.3%, same-store sales increased 12.2%, while diluted EPS increased 62.7% to $2.31. The press release also quoted defendant Vasos, who emphasized that "[o]verall, our ongoing operating priorities, coupled with our key strategic initiatives, position us well to continue delivering value and convenience for our customers, along with long-term sustainable growth and value for our shareholders." Further, the press release emphasized that "[g]ross profit as a percentage of net sales was 31.3% in the third quarter of 2020 ... an increase of 178 basis points," and noted that:

> This gross profit rate increase was primarily attributable to a reduction in markdowns as a percentage of net sales, higher initial markups on inventory purchases, a greater proportion of sales coming from the non-consumables product categories, which generally have a higher gross profit rate than the consumables product category, and a reduction in inventory shrink as a percentage of net sales.

93. On the same day, Dollar General held an earnings conference call with analysts and investors to discuss the 3Q20 results, led by defendants Vasos, Garratt, and Owen. During his prepared remarks, defendant Owen highlighted purported customer satisfaction with the Company's store operations. Specifically, defendant Owen stated: "We continue to build on our success with Fast Track, which [defendant Vasos] will discuss in more detail later," and that "[a]s a result of our efforts to-date, our store associates are able to better serve our customers during this period of heightened demand, as evidenced by our recent customer survey results where we continue to see overall satisfaction scores at all-time highs."

94. Similarly, on the same call, defendant Vasos stated: "We continue to be pleased with the labor productivity improvements we are seeing as a result of our efforts around rolltainer optimization and even more shelf-ready packaging."

95. Also on December 3, 2020, Dollar General filed its Quarterly Report on Form 10-Q for the 3Q20 ended October 30, 2020 (the "3Q20 Form 10-Q") with the SEC, which was signed by defendant Garratt and certified pursuant to SOX by defendants Vasos and Garratt. The 3Q20 Form 10-Q provided the same financial results reported in the 3Q20 press release and stated that "[g]ross profit, as a percentage of net sales, was 31.3% in the 2020 period ... an increase of 178 basis points, primarily reflecting favorable markdowns, higher initial inventory markups, and an increase in sales of products in our non-consumable categories." Discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the 3Q20 Form 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

96. On March 18, 2021, Dollar General issued a press release providing its fourth quarter and fiscal year 2020 ("4Q20" and "FY20," respectively) financial results. The press release stated that net sales increased 17.6%, same-store sales increased 12.6%, and operating profit increased 21%, while diluted EPS increased 24.8% to $2.62. The press release quoted defendant Vasos who stated that "[w]e continue to operate from a position of strength, and are excited about our plans for 2021 to continue delivering value and convenience for our customers, along with long-term sustainable growth and value for our shareholders." Further, the press release emphasized that "[g]ross profit as a percentage of net sales was 32.5% in the fourth quarter of 2020 ... an increase of 77 basis points," and that "[t]his gross profit rate increase was primarily

attributable to a reduction in markdowns as a percentage of net sales; higher initial markups on inventory purchases ... and a reduction in inventory shrink as a percentage of net sales."

97. On the same day, Dollar General held an earnings conference call with analysts and investors to discuss the Company's 4Q20 and FY20 results led by defendants Vasos, Garratt, and Owen. During their prepared remarks, defendants Vasos, Garratt, and Owen continued to praise the Company's supposedly effective management of its inventory. Specifically, defendant Vasos noted that "[c]ollectively, our fourth quarter and full year results reflect strong and disciplined execution across many fronts and further validate our belief that we are pursuing the right strategies to enable sustainable growth while creating meaningful long-term shareholder value." Next, defendant Garratt stated that "[w]hile a lot of stocks remain higher than we would like for certain high-demand products, we continue to make good progress with improving our in-stock position and are pleased with our overall inventory levels." Further, defendant Owen stated: "[w]e continue to build on our success with electronic article surveillance by increasing the number of items tagged while further leveraging technology to drive even higher levels of in-store execution." Defendant Owen also lauded the purported strength of the Company's store stocking procedures, stating that "[o]ur Fast Track initiative is a great example of this approach, where our goals include increasing labor productivity in our stores, enhancing customer convenience and further improving on-shelf availability," adding that "[w]e continue to be pleased with the labor productivity improvements we are seeing as a result of our efforts around both rolltainer and case pack optimization, which have led to the more efficient stocking of our stores."

98. During the Question & Answer portion of the earnings call, defendant Garratt responded to an analyst's question about margin sustainability, and highlighted the purported optimization of the Company's product pricing efforts. Specifically, defendant Garratt stated:

> Again, when you look at our scale and our growing scale as a limited SKU shop, it really puts us in a very favorable position to get best pricing there and protect our margins while also being well priced. And on the price front, we'll always reserve the right to invest as needed. ***But as we look at now and as we've seen for quite a while now, we feel like we're in the best position on pricing we've been in and don't see, at least [for] the foreseeable future, the need to invest there. So we feel good about the long-term ability to continue to grow gross margin while also driving traffic and sales.***

99. On March 19, 2021, Dollar General filed its Annual Report on Form 10-K for the FY20 ended January 29, 2021 (the "FY20 Form 10-K") with the SEC, which was signed by defendants Vasos, Garratt, Bryant, Calbert, Fili-Krushel, McGuire, Rhodes, Sandler, and Santana, and certified pursuant to SOX by defendants Vasos and Garratt. The FY20 Form 10-K provided the same financial results reported in the FY20 press release and stated that "[o]ur gross profit rate increased by 117 basis points due primarily to lower markdowns as a percentage of sales and higher initial markups on inventory purchases." In discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the FY20 Form 10-K stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances." The FY20 Form 10-K also highlighted the importance of Dollar General's efficient inventory management, and stated that:

> Efficient inventory management is a key component of our business success and profitability. We must maintain sufficient inventory levels and an appropriate product mix to meet our customers' demands without allowing those levels to increase such that the costs to store and hold the goods unduly impacts our financial results or increases the risk of inventory shrinkage.

100. On May 27, 2021, Dollar General issued a press release announcing its first quarter 2021 ("1Q21") financial results. The press release stated that same-store sales decreased 4.6%, and operating profit increased 4.9%, while diluted EPS increased 10.2% to $2.82. The press release quoted defendant Vasos, who stated that "[g]iven our first-quarter outperformance, we are

raising our financial outlook for fiscal 2021," adding that "we are well-positioned to continue delivering long-term sustainable growth and value for our shareholders." The press release also emphasized that "[g]ross profit as a percentage of net sales was 32.8% in the first quarter of 2021 ... an increase of 208 basis points," and noted that "[t]his gross profit rate increase was primarily attributable to higher initial markups on inventory purchases; a reduction in markdowns as a percentage of net sales; a greater proportion of sales coming from the non-consumables product categories ...; and a reduction in inventory shrink as a percentage of net sales."

101. On the same day, Dollar General held an earnings conference call with analysts and investors to discuss the Company's 1Q21 results, led by defendants Vasos, Garratt, and Owen. In his opening remarks, defendant Garratt stated that Dollar General was "pleased with the overall quality of our inventory." Defendant Garratt concluded his opening remarks by representing that the Company's purportedly efficient store management practices were sustainable and would drive long-term shareholder value. Specifically, defendant Garratt stated that "we continue to be disciplined in how we manage expenses and capital with the goal of delivering consistent, strong financial performance while strategically investing for the long term," and adding that "[w]e remain confident in our business model and our ongoing financial priorities to drive profitable same-store sales growth, healthy new store returns, strong free cash flow and long-term shareholder value."

102. Similarly, during the same call, defendant Owen highlighted the increased efficiency of the Company's store operations and stated:

> Over the years, we have established a clear and defined process to control spending, which governs our disciplined approach to spending decisions. This zero-based budgeting approach, internally branded as Save to Serve, keeps the customer at the center of all we do while reinforcing our cost control mindset. ***Our Fast Track initiative is a great example of this approach where our goals include: increasing labor productivity in our stores, enhancing customer convenience and further***

> ***improving on-shelf availability. We continue to be pleased with the labor productivity improvements we are seeing as a result of our efforts, both around rolltainer and case pack optimization, which have led to even more efficient stocking of our stores.***

103. Also on May 27, 2021, Dollar General filed its Quarterly Report on Form 10-Q for the 1Q21 ended April 30, 2021 (the "1Q21 Form 10-Q"), which was signed by defendant Garratt and certified pursuant to SOX by defendants Vasos and Garratt. The 1Q21 Form 10-Q provided the same financial results reported in the 1Q21 release. Specifically, the 1Q21 Form 10-Q stated that "[g]ross profit, as a percentage of net sales, was 32.8% in the 2021 period ... primarily reflecting higher initial inventory markups, favorable markdowns, and an increase in sales of products in non-consumable categories." Further, in discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the 1Q21 Form 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

104. On August 26, 2021, prior to the opening of trading, Dollar General issued a press release announcing its second quarter 2021 ("2Q21") financial results. The press release stated that while same-store sales decreased 4.7%, Dollar General had achieved operating profit of $849.6 million, and diluted EPS of $2.69.

105. On the same day, Dollar General held an earnings conference call with analysts and investors to discuss the 2Q21 results, led by defendants Vasos, Garratt, and Owen. Defendant Vasos stated that "[w]e believe we will ultimately exit the pandemic with a larger, broader and more engaged customer base than when we entered it, resulting in an even stronger foundation from which to grow." Defendant Vasos then added: "In short, I feel very good about the underlying strength of the business, and we're confident we are pursuing the right strategies to enable balanced and sustainable growth by creating meaningful long-term shareholder value."

106. During the same call, defendant Garratt commented on the Company's current inventory levels, stating that "we were pleased with our strong inventory position for the back-to-school shopping season, and our teams continue to work closely with suppliers to ensure delivery of seasonal and other goods in the remaining back half of the year." Defendant Garratt concluded his opening remarks by highlighting the purported sustainability of the Company's efficient business model. Specifically, defendant Garratt stated: "As always, we continue to be disciplined in how we manage expenses and capital, with the goal of delivering consistent, strong financial performance while strategically investing for the long term," and adding that "[w]e remain confident in our business model and ongoing financial priorities to drive profitable same-store sales growth, healthy new store returns, strong free cash flow and long-term shareholder value."

107. Similarly, during the same call, defendant Owen highlighted Dollar General's efforts to optimize store stocking, stating:

> ***Our Fast Track initiative is a great example of this approach, where our goals include increasing labor productivity in our stores, enhancing customer convenience and further improving on-shelf availability. The first phase of Fast Track consisted of optimizing our rolltainers and case pack sizes, resulting in the more efficient stocking of our stores.***

108. Also on August 26, 2021, Dollar General filed its Quarterly Report on Form 10-Q for the 2Q21 ended July 30, 2021 (the "2Q21 Form 10-Q") with the SEC, which was signed by defendant Garratt and certified pursuant to SOX defendants Vasos and Garratt. The 2Q21 Form 10-Q provided the same financial results reported in the 2Q21 press release and stated that "[g]ross profit, as a percentage of net sales, was 31.6% in the 2021 period." In discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the 2Q21 Form 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

109. On December 2, 2021, Dollar General issued a press release announcing its third quarter 2021 ("3Q21") financial results. The press release stated that net sales increased 3.9%, while Dollar General had achieved operating profit of $665.6 million, and diluted EPS of $2.08. The press release also emphasized that "[g]ross profit as a percentage of net sales was 30.8% in the third quarter of 2021," noting that the Company had experienced "higher inventory markups and a reduction in inventory shrink as a percentage of net sales."

110. On the same day, Dollar General held an earnings conference call with analysts and investors to discuss the 3Q21 results, led by defendants Vasos, Garratt, and Owen. During his opening remarks, defendant Vasos stated "[c]ollectively, our third quarter results reflect strong execution across many fronts and further validates our belief that we are pursuing the right strategies to enable sustainable growth, while supporting long-term shareholder value creation." Next, defendant Garratt highlighted the Company's cost-efficient business model and stated:

> As always, we continue to be disciplined in how we manage expenses and capital, with the goal of delivering consistent, strong financial performance, while strategically investing for the long term. We remain confident in our business model and our ongoing financial priorities to drive profitable same-store sales growth, healthy new store returns, strong free cash flow and long-term shareholder value.

111. On the same call, defendant Owen highlighted the Company's purportedly efficient and effective store operations in his opening remarks, stating:

> ***Our Fast Track initiative is a great example of this approach, where our goals include increasing labor productivity in our stores, enhancing customer convenience and further improving on-shelf availability.***
>
> ***The first phase of Fast Track consisted of both rolltainer and case pack optimization, which has led to the more efficient stocking of our stores.***

112. Also on December 2, 2021, Dollar General filed its Quarterly Report on Form 10-Q for the 3Q21 ended October 29, 2021 (the "3Q21 Form 10-Q") with the SEC, which was signed by defendant Garratt and certified pursuant to SOX by defendants Vasos and Garratt. The 3Q21

Form 10-Q provided the same financial results reported in the 3Q21 press release and stated that "[g]ross profit, as a percentage of net sales, was 30.8% in the 2021 period." In discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the 3Q21 Form 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

113. On March 17, 2022, Dollar General issued a press release announcing its fourth quarter and fiscal year 2021 ("4Q21" and "FY21," respectively") financial results. The press release stated that although 4Q21 diluted EPS decreased 1.9% to $2.57, Dollar General's net sales increased 2.8% during the quarter. The press release also quoted defendant Vasos who stated that Dollar General's "teams remained focused on executing our operating priorities and advancing our strategic initiatives, which we believe position us well for solid sales and profit growth in 2022 and beyond." The press release also emphasized that "[g]ross profit as a percentage of net sales was 31.2% in the fourth quarter of 2021," noting that factors positively contributing to the result were "a reduction in markdowns as a percentage of net sales and higher inventory markups."

114. On the same day, Dollar General held an earnings conference call with analysts and investors to discuss the Company's 4Q21 and FY21 results, led by defendants Vasos, Garratt, and Owen. In his opening remarks, defendant Garratt highlighted the Company's inventory levels and stated that "we have begun to see a meaningful improvement in our in-stock levels since the end of the year and expect continued improvement as we move through 2022, underscoring our optimism that we are well positioned to serve our customers with the products they want and need." Defendant Garratt also highlighted the purported sustainability of the Company's efficient operating model, stating that "[a]s always, we continue to be disciplined in how we manage expenses and capital with the goal of delivering consistent, strong financial performance while

strategically investing in our business and employees for the long term," and adding that "[w]e remain confident in our business model and our ongoing financial priorities to drive profitable same-store sales growth, healthy new store returns, strong free cash flow and long-term shareholder value."

115. On the same call, defendant Owen similarly emphasized the Company's store stocking practices, stating:

> ***Notably, the Save to Serve program contributed more than $800 million in cumulative cost savings from its inception in 2015 through the end of 2021. Our Fast Track initiative is a great example of this approach, where our goals include increasing labor productivity in our stores, enhancing customer convenience and further improving on-shelf availability.***
>
> ***The first phase of Fast Track consisted of both rolltainer and case pack optimization, which has led to the more efficient stocking of our stores.***

116. On March 18, 2022, Dollar General filed its Annual Report on Form 10-K for the FY21 ended January 29, 2022 (the "FY21 Form 10-K") with the SEC, which was signed by defendants Vasos, Garratt, Bryant Calbert, Fili-Krushel, McGuire, Rhodes, Sandler, and Santana, and certified pursuant to SOX by defendants Vasos and Garratt. The FY21 Form 10-K provided the same financial results reported in the FY21 press release. Discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the FY21 Form 10-K stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances." Further, the FY21 Form 10-K stated that "[e]fficient inventory management is a key component of our business success and profitability," and that Dollar General "must maintain sufficient inventory levels and an appropriate product mix to meet our customers' demands without allowing those levels to increase such that the costs to store and hold the goods unduly impacts our financial results or increases the risk of inventory shrinkage."

117. On May 26, 2022, Dollar General issued a press release announcing its first quarter 2022 ("1Q22") financial results. The press release stated that although diluted EPS decreased 14.5% to $2.41, Dollar General's net sales increased 4.2% during the quarter. The press release quoted defendant Vasos as stating that "[w]e continue to drive strategic innovation as we further differentiate Dollar General in the discount retail channel, while delivering long-term sustainable growth and value for our shareholders." The release also emphasized that "[g]ross profit as a percentage of net sales was 31.3% in the first quarter of 2022," noting that "higher inventory markups" contributed to the gross profits.

118. On the same day, Dollar General held an earnings conference call with analysts and investors to discuss the 1Q22 results, led by defendants Vasos, Garratt, and Owen. Defendant Vasos opened his remarks by emphasizing that he was "pleased to report that [Dollar General] ha[d] continued to make improvements in [its] overall in-stock position, which [we] believe positions [the Company] well to drive strong top line performance through the remainder of the year." Next, in defendant Garratt's opening remarks, he commented on inventory levels and stated, "[i]mportantly, we continue to believe the quality of our inventory is in good shape and that we are well positioned with the right mix and balance of products."

119. During the same call, defendant Owen highlighted the Company's store stocking functions as being beneficial to the Company's business metrics and financial prospects, stating:

> ***Our Fast Track initiative is a great example of this approach, where our goals include increasing labor productivity in our stores, enhancing customer convenience and further improving on-shelf availability. The first phase of Fast Track consisted of both rolltainer and case pack optimization, which has led to the more efficient stocking of our stores.***

120. Also on May 26, 2022, Dollar General filed its Quarterly Report on Form 10-Q for the 1Q22 ended April 29, 2022 (the "1Q22 Form 10-Q") with the SEC, which was signed by

defendant Garratt and certified pursuant to SOX by defendants Vasos and Garratt. The 1Q22 Form 10-Q provided the same financial results reported in the 1Q22 press release. The 1Q22 Form 10-Q further stated that "[g]ross profit, as a percentage of net sales, was 31.3% in the 2022 period." Discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the 1Q22 Form 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

121. On August 25, 2022, Dollar General issued a press release announcing its second quarter 2022 ("2Q22") financial results. In addition to reporting that net sales increased 9%, same-store sales increased 4.6%, and operating profit increased 7.5%, while diluted EPS increased 10.8% to $2.98, the press release quoted defendant Vasos as stating: "Looking ahead, we are confident that our strategic actions, which have transformed this company in recent years and solidified Dollar General as the clear leader in small-box discount retail, have positioned us well for continued success, while supporting long-term shareholder value creation." The press release also emphasized that "[g]ross profit as a percentage of net sales was 32.3% in the second quarter of 2022," noting that "[t]his gross profit rate increase was primarily attributable to higher inventory markups."

122. Later on the same day, Dollar General held an earnings conference call with analysts and investors to discuss the 2Q22 results, led by defendants Vasos, Garratt, and Owen. In his prepared remarks, defendant Garratt represented that "importantly, we continue to believe the quality of our inventory is in good shape." As to his update on the Company's financial outlook for FY22, defendant Garratt stated that "we are confident in the business, and as [defendant Vasos] mentioned, we are increasing our sales outlook for 2022," noting that "[f]or the full year, we now expect the following: net sales growth of approximately 11%, including an estimated benefit of

approximately 2 percentage points from the 53rd week," and "[a]dditionally, we are reiterating the remainder of our financial guidance for 2022, which includes EPS growth of approximately 12% to 14%."

123. In addition, defendant Owen highlighted the Company's purported optimization of its store stocking operations, stating:

> ***Our Fast Track initiative is a great example of this approach, where our current goals include increasing labor productivity in our stores and enhancing customer convenience. The first phase of Fast Track consisted of both rolltainer and case pack optimization, which has led to the more efficient stocking of our stores.***

124. During the Question & Answer session, defendant Vasos represented that the Company's inventory "couldn't be better," stating:

> ***As it relates to the inventory levels, we couldn't be happier with where we sit today on inventory. We did all the right things early on, Michael, as you would imagine, coming from a Dollar General. We were well ahead of any inventory issues that may pop up unlike some of our competitors out there.*** We canceled orders as early as December because we saw where the customer was headed. We actually have canceled orders not only into Q2, but into the back half of the year. And all of our guidance is contemplated on that. ***So we feel very strong. The quality of our inventory couldn't be better. And as we move forward, we believe that will benefit us as we move into the back half of this year and into next year.***

125. Also on August 25, 2022, Dollar General filed its Quarterly Report on Form 10-Q for the 2Q22 ended July 29, 2022 (the "2Q22 Form 10-Q") with the SEC, which was signed by defendant Garratt and certified pursuant to SOX by defendants Vasos and Garratt. The 2Q22 Form 10-Q provided the same financial results reported in the 2Q22 press release and stated that "[g]ross profit, as a percentage of net sales, was 32.3% in the 2022 period ... an increase of 69 basis points, primarily reflecting higher inventory markups." Discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the 2Q22 Form 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

126. On December 1, 2022, Dollar General issued a press release announcing its third quarter 2022 ("3Q22") financial results. The press release stated that net sales increased 11.1%, same-store sales increased 6.8%, and operating profit increased 10.5%, while diluted EPS increased 12% to $2.33. The press release quoted defendant Owen as emphasizing that Dollar General was "pleased with our strong sales growth in the quarter, as well as a modest increase in customer traffic and continued share gains in both consumable and non-consumable product sales."

127. In addition, the 3Q22 press release provided the following update to the Company's 4Q22 and FY22 guidance:

> The Company now expects the following:
>
> - Same-store sales growth of approximately 6% - 7% for the fourth quarter of fiscal year 2022, which would result in growth toward the upper end of its previously expected range of 4.0% - 4.5% for fiscal year 2022;
>
> - Diluted EPS in the range of $3.15 - $3.30 for the fourth quarter of fiscal year 2022, which would result in growth in the range of approximately 7% - 8% for fiscal year 2022; compared to its previous expectation in the range of approximately 12% - 14% for fiscal year 2022[.]
>
> *     *     *
>
> The Company continues to expect the following for fiscal year 2022:
>
> - Net sales growth of approximately 11%, including an estimated benefit of approximately two percentage points from the 53rd week[.]

128. Also on December 1, 2022, Dollar General held an earnings conference call with analysts and investors to discuss the 3Q22 results, led by defendants Garratt and Owen. Defendant Garratt commented on the quarterly increase in inventory levels and represented that the increase was primarily due to cost inflation, mix changes, and seasonal impacts, stating:

> Merchandise inventories were $7.1 billion at the end of the third quarter, an increase of 34.8% overall and 28.4% on a per store basis. ***Similar to the first half of the***

***year, this increase primarily reflects the impact of product cost inflation, a greater mix of higher-value products, particularly in the home and seasonal categories, primarily due to the continued rollout of our non-consumables' initiative, and the early receipt of seasonal goods.***

129. Providing an update on Dollar General's financial outlook for FY22, defendant Garratt stated:

> On year-to-date sales performance and our expectations for the remainder of Q4, ***we are reiterating our fiscal 2022 full year expectations for net sales growth of approximately 11%, including an estimated benefit of approximately 2 percentage points from the 53rd week, and we are updating our expectation for same-store sales growth for Q4, which we expect same-store sales growth in the range of 6% to 7%, which would result in growth toward the upper end of our previous range of approximately 4% to 4.5%.***

Further, defendant Garratt went on to emphasize that "despite the near-term challenges, we are confident in the business and our outlook for the remainder of the year," adding that "we feel good about the sales momentum going into next year, coupled with moderating cost pressures."

130. On the same call, during his opening remarks, defendant Owen emphasized that the Company's "third operating priority is to leverage and reinforce [its] position as a low-cost operator." Defendant Owen further represented that Dollar General had "a clear and defined process to control spending, which continues to govern [its] disciplined approach to spending decisions," and stated that "[t]his approach, internally branded as Save to Serve, keeps the customer at the center of all we do, while reinforcing our cost control mindset."

131. Further, during the Question & Answer session of the call, in response to an analyst's question as to "just what inning do you see the drivers of inventory markup in today," defendant Garratt stated that Dollar General was effectively managing its inventory and mitigating markdown risks, stating:

> You asked about markdowns as well. I didn't want to miss that question. As you look at markdown risk, while up from the unusually low levels last year,

> markdowns are still well below pre-pandemic levels. ***If you look at the majority of the inventory growth, it's really driven by inflation.***
>
> ***The team has done a good job anticipating the mix shift in consumer demand and has proactively been adjusting orders. And as a result, we feel very good about the quality of the inventory, ability to mitigate the markdown risk. As always, we've set aside, what we believe is an appropriate markdown level for the upcoming Christmas season. And of course, this is all reflected in our guidance.***

132. Later during the call, defendant Garrett downplayed the risk of significant inventory losses, claiming any adverse effects would be short-lived and were being effectively addressed by the Company, stating:

> The other piece – we did see – we mentioned as we progressed through Q3 is a greater headwind from inventory shrink and damages. And that shrink can have a tail to that. Rest assured, the team knows how to deal with this and is taking actions to address it. ***But it does have a tail to it. And then while we are making good progress resolving our storage capacity constraints with the capacity online, we do believe, as we mentioned, that some of this will carry over into Q4, but be largely resolved by Q1.***

133. Also on December 1, 2022, Dollar General filed its Quarterly Report on Form 10-Q for the 3Q22 ended October 28, 2022 (the "3Q22 Form 10-Q") with the SEC, which was signed by defendant Garratt and certified pursuant to SOX by defendants Owen and Garratt. The 3Q22 Form 10-Q provided the same financial results reported in the 3Q22 press release. The 3Q22 Form 10-Q further stated that "[g]ross profit, as a percentage of net sales, was 30.5% in the 2022 period." Discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the 3Q22 Form 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

134. The statements referenced above were improper when made because they failed to disclose and misrepresented the following material, adverse facts to investors, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that: (i) Dollar General stores were chronically understaffed and suffering from logistical and inventory

management problems which left stores with tens of millions of dollars' worth of outdated and unwanted inventory, mispriced goods, and lost and damaged items; (ii) that large backlogs of unsellable merchandise had built up at Dollar General's stores, which inventory had not been timely written down due to understaffing and the Company's failure to manage its inventory; (iii) that the allotment of employee hours per store per week imposed by Dollar General's management placed employees in virtually impossible situations where assigned tasks, including those necessary to effective store operations, could not be completed within the allotted time; (iv) that Dollar General was systematically overcharging customers for items upon checkout above the listed price in violation of state laws, including state law violations identified by state regulators in Arizona, Louisiana, Mississippi, Missouri, North Carolina, and Ohio; (v) that Dollar General's reported revenue and earnings were artificially inflated by defendants' overpricing scheme; (vi) that Dollar General's failure to manage store inventories and accurately price items upon checkout risked the loss of customers, lower sales, adverse regulatory actions, and reputational fallout; (vii) that Dollar General was not on track to achieve the 4Q22 guidance provided to investors of 6% to 7% same-store sales growth or quarterly diluted EPS of $3.15 to $3.30, and was running more than $100 million behind the Company's annual net sales guidance of 11% growth; and (viii) that as a result of the foregoing, the defendants' statements about Dollar General's business metrics, operations, and financial prospects were materially false and misleading when made.

## THE TRUTH SLOWLY STARTS EMERGING WHILE DEFENDANTS CONTINUE TO MISLEAD THE MARKET

135. The truth finally started to emerge when on February 23, 2023, Dollar General unexpectedly pre-released its preliminary 4Q22 and FY22 financial results. The Company disclosed that 4Q22 sales and earnings would come in materially below what the Company had led investors to expect as recently as December 2022. Specifically, the press release stated:

> The company expects to report financial results for the fiscal 2022 fourth quarter and full year below the expectations provided on its conference call on December 1, 2022. Despite continued market share gains in sales of both consumable and non-consumable products, same-store sales for the fourth quarter increased 5.7%, compared to the company's previous expectation of approximately 6% - 7%. The company now expects diluted earnings per share for the fourth quarter in the range of $2.91 - $2.96, compared to its previous expectation in the range of $3.15 - $3.30.
>
> For the fiscal year, same-store sales increased 4.3%, compared to the company's previous expectation of being toward the upper end of a range of 4.0% - 4.5%, and the company expects diluted earnings per share growth in the range of approximately 4.5% - 5.0%, compared to its previous expectation of approximately 7% - 8%.

136. On this news, Dollar General's stock declined by 4.89%, or $11.02 per share, on February 24, 2023, to close at $214.25 per share compared to its February 22, 2023 closing of $225.27 per share, erasing approximately $2.4 billion in market capitalization over two days.

137. Next, on March 16, 2023, Dollar General issued a press release providing the Company's 4Q22 and FY22 results. The press release revealed that during 4Q22 net sales rose only 17.9% year-over-year to $10.2 billion and for the full year net sales only rose 10.6% to $37.8 billion, missing the Company's prior annual net sales guidance by approximately $140 million. Similarly, the Company reported annual EPS growth of only 5%, up to 38% below the prior growth range provided to investors. In the press release, Dollar General acknowledged that it had experienced a "decrease in customer traffic," which the Company attributed to the sales miss to "the impact of store closures." Further, Dollar General revealed it would be required to make a one-time "***incremental investment of approximately $100 million in our stores, primarily in incremental labor hours***, as we look to build on our sales momentum and capture additional market share by further enhancing store standards and the in-store experience."

138. On this news, Dollar General's stock declined by 2.96%, or $6.47 per share, on March 16, 2023, to close at $212.09 per share compared to its March 15, 2023 closing of $218.56 per share, erasing approximately $1.4 billion in market capitalization over one day.

139. However, the Company failed to disclose the full truth and instead continued to materially misrepresent Dollar General's business, operations, and financial results. For example, defendants continued to conceal the impact that the cluttered stores and overpricing scheme had on Dollar General's customers' spending or the need for the Company to take a substantial write-down of its existing inventory. Defendants also failed to disclose the impact of the various regulatory enforcement actions pending against the Company and the reduction in revenue that would necessarily result when customers were no longer being systematically overcharged at the register.

140. In the 4Q22 and FY22 press release, defendant Owen (who by then had transitioned to CEO to replace defendant Vasos who had purportedly retired from the position), represented that the Company's "incremental investment will yield strong returns as we continue creating long-term sustainable growth and value for our shareholders." The press release emphasized that "[g]ross profit as a percentage of net sales was 30.9% in the fourth quarter of 2022," noting that factors positively contributing to the result were "higher inventory markups and a reduction in transportation costs."

141. Also on March 16, 2023, Dollar General held an earnings conference call with analysts and investors to discuss the 4Q22 and FY22 results, led by defendants Owen and Garratt. Defendant Owen emphasized that Dollar General's "storage capacity constraints [are] largely behind us, which we believe positions us well moving forward." Similarly, in his prepared remarks, defendant Garratt downplayed the significant growth in inventories, stating:

> ***This increase continues to reflect the impact of product cost inflation as well as a greater mix of higher-value products, particularly in the home and seasonal categories, primarily due to the continued rollout of NCI as well as the earlier receipt of seasonal goods. While inventory growth is still elevated, the pace is moderating as we expected.*** Notably, our Q4 inventory growth rate per store was essentially half of what it was in Q3. Looking ahead, we anticipate more normalized growth rates as we move through 2023.
>
> ***Importantly, we continue to believe the quality of our inventory is in good shape.***

142. On the call, defendant Garratt also commented on the Company's financial outlook for FY23. Specifically, defendant Garratt stated: "We anticipate the challenging economic and operating environment to continue into 2023, but we believe we are well positioned to drive strong growth as we move throughout the year," adding that "[f]or 2023, we are reiterating the financial guidance we provided on February 23, 2023" of same-store sales growth of 3% to 3.5% and diluted EPS growth of 4% to 6% compared to the prior year.

143. Later in the call, defendant Garratt once again downplayed the Company's inventory growth and claimed the Company was satisfied with inventory levels, stating:

> In terms of the AP to inventory, what we have seen is the driver of that is really higher inventory levels, coupled with the timing of payments. As you look at the timing of payments, one of the things, for instance, that impacts with the 53rd week, it then pulls in the week 1 rent payment.
>
> ***So as we look further, we expect inventory levels to normalize.*** As you look at – in Q4, we saw our inventory per store dropped in half. It went – it was 14% on a per store basis, which was about half the growth rate we saw in the previous period – or previous quarter. ***And again, it reflects the same drivers that's really the product cost inflation and a greater mix of higher-value products, particularly in NCI as we completed the rollout of that.***
>
> Important thing to note here is it is seasonal goods – or it's early receipt of seasonal goods or was there other driver. But it's important to note that these are evergreen-type products, which aren't time-sensitive. ***So we feel really good about the quality of the inventory, the ability to move through that and expect this to continue to normalize as we move through the year.***

144. On March 24, 2023, Dollar General filed its FY22 Form 10-K, which was signed by defendants Owen, Garratt, Bryant, Calbert, Chadwick, Fili-Krushel, McGuire, Rhodes, Sandler, Santana, and Vasos, and certified pursuant to SOX by defendants Owen and Garratt. The FY22 Form 10-K provided the same financial results reported in the 4Q22 and FY22 press release. Discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the FY22 Form 10-K stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances." The FY22 Form 10-K further stated that "[e]fficient inventory management is a key component of our business success and profitability," and that Dollar General "must maintain sufficient inventory levels and an appropriate product mix to meet our customers' demands without allowing those levels to increase such that the costs to store and hold the goods unduly impacts our financial results or increases the risk of inventory shrinkage or damages."

145. The statements referenced above were improper when made because they failed to disclose and misrepresented the following material, adverse facts to investors, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that: (i) Dollar General stores were chronically understaffed and suffering from logistical and inventory management problems which left stores with tens of millions of dollars' worth of outdated and unwanted inventory, mispriced goods, and lost and damaged items; (ii) that large backlogs of unsellable merchandise had built up at Dollar General's stores, which inventory had not been timely written down due to understaffing and the Company's failure to manage its inventory; (iii) that the allotment of employee hours per store per week imposed by Dollar General's management placed employees in virtually impossible situations where assigned tasks, including those necessary to effective store operations, could not be completed within the allotted time; (iv) that

Dollar General was systematically overcharging customers for items upon checkout above the listed price in violation of state laws, including state law violations identified by state regulators in Arizona, Louisiana, Mississippi, Missouri, North Carolina, and Ohio; (v) that Dollar General's reported revenue and earnings were artificially inflated by defendants' overpricing scheme; (vi) that Dollar General's failure to manage store inventories and accurately price items upon checkout risked the loss of customers, lower sales, adverse regulatory actions, and reputational fallout; (vii) that Dollar General was not on track to achieve its FY23 guidance provided to investors of 5.5% to 6% net sales growth, 3% to 3.5% same-store sales growth, or 4% to 6% diluted EPS growth, and was running more than $100 million behind the Company's annual net sales guidance and actually suffering declining diluted EPS rather than the growth represented to investors; and (viii) that as a result of the foregoing, the defendants' statements about Dollar General's business metrics, operations, and financial prospects were materially false and misleading when made.

146. On June 1, 2023, Dollar General shocked the market by reporting deeply disappointing 1Q23 results for the period ended May 5, 2023. The Company reported 1Q23 revenue of $130 million below analysts' estimates. The Company also slashed its FY23 financial forecast, stating it only expected FY23 same-store sales to rise between 1% and 2% for the year, a reduction of more than 50% at the midpoint from its prior same-store sales growth forecast of 3% to 3.5%, and that it further only expected FY23 net sales growth in the range of 3.5% to 5% for the year, down 26% at the midpoint from the prior 5.5% to 6% range provided in March 2023. In addition, Dollar General reported that its diluted EPS was on track to decrease by up to 8% for the year compared to the Company's previously projected EPS growth of 4% to 6%.

147. On the same day, during the Company's earnings conference call with analysts and investors, defendant Owen conceded that "[w]ith our previously announced investment in

incremental store labor hours, we continue to enhance the customer experience, including a material improvement in customer satisfaction scores since prior year-end." Defendant Owen's concession finally partially acknowledged the extent to which Dollar General stores had fallen into disarray, which damaged customer perceptions of the Company and, ultimately, its sales.

148. On this news, Dollar General's market capitalization plunged 19.5% over one trading day, from its closing price of $201.09 per share on May 31, 2023, to close at $161.86 per share on June 1, 2023, a decline of $39.23 per share, erasing approximately $8.6 billion in market capitalization.

149. However, once again defendants failed to disclose the full truth regarding Dollar General's business, operations, and financial results. Specifically, the 1Q23 press release quoted defendant Owen as stating that Dollar General had "made significant progress improving our execution on multiple fronts, including on our supply chain recovery efforts and enhancements to the customer experience with our previously announced investment in incremental labor hours." Defendant Owen added that "[l]ooking ahead, we feel good about our position, and are taking action to better serve our core customer, which is our most important calling at Dollar General" and that "[o]verall, we remain well positioned to serve all of our customers with our unique combination of value and convenience, while also creating long-term shareholder value."

150. The 1Q23 press release also provided updated guidance, stating:

> The Company remains confident in the business and its long-term growth prospects, but is revising its outlook for fiscal year 2023, provided on March 16, 2023, to reflect these more challenging macroeconomic headwinds, and now expects:
>
> - Net sales growth in the range of approximately 3.5% to 5.0%, compared to its previous expectation of 5.5% to 6%; both of which include an anticipated negative impact of approximately two percentage points due to lapping the fiscal 2022 53rd week

- Same-store sales growth in the range of approximately 1.0% to 2.0%, compared to its previous expectation of 3.0% to 3.5%

- Diluted EPS in the range of an approximate 8% decline to flat, compared to its previous expectation of growth of approximately 4% to 6%, both of which include an anticipated negative impact of approximately four percentage points due to lapping the fiscal 2022 53rd week

    - The updated Diluted EPS guidance includes an anticipated negative impact of approximately four percentage points due to higher interest expense in fiscal 2023, compared to the anticipated negative impact of approximately three percentage points included in the prior EPS guidance.

* * *

- Capital expenditures, including those related to investments in the Company's strategic initiatives, in the range of $1.6 billion to $1.7 billion, compared to its previous expectation of $1.8 billion to $1.9 billion.

151. Also on June 1, 2023, Dollar General held an earnings conference call with analysts and investors to discuss the 1Q23 results, led by defendants Owen and Dilts. During the call, defendant Owen stated that Dollar General was "refining our inventory management process, including making some structural reporting realignments within our team to allow us to move more nimbly to respond to customer demand and the needs of the business."

152. Further, during the Question & Answer session of the call, defendant Dilts downplayed the extent of the Company's inventory problems, stating:

> ***We continue to feel good about the quality of the inventory. But I will say inventory management remains a focus for us.*** So inventory growth was relatively consistent with Q4, although we had hoped that it would come in somewhat lower this quarter. The good news here is what I would say is we made some progress on working down the non-consumable inventory. It was offset, though, by improved consumable in-stock levels. And as Jeff noted, with the supply chain health, that's where we got those in-stock levels from.
>
> So just a couple of facts for you. We reacted pretty quickly to the current environment by reducing non-consumable receipts. And frankly, I'd say we acted historically as well because some of those receipts were pulled back almost a year ago and in reaction to the discretionary spend trends that we were seeing. So in

Q1, our non-consumable receipts were actually down over 30%, and we expect that trend to continue into Q2.

And with that, what we saw was a 3% reduction in non-consumable inventory per store from Q4. So nice movement there. ***And we do expect it to get more normalized levels in the back half of the year. Again, at the same time, our supply chain service levels improved faster than we expected, and that drove some consumable products to the store, which was one of the main contributors, as you look, on either a year-over-year basis or a quarter-over-quarter basis.***

***So I'd just end with, we know that inventory remains an opportunity for us, and we're going to continue working on reducing those levels with the goal to remain in line with sales, and we believe that the new structure we put in place will make sure that we get that done.***

153. Also on June 1, 2023, Dollar General filed its Quarterly Report on Form 10-Q for the 1Q23 ended May 5, 2023 (the "1Q23 Form 10-Q") with the SEC, which was signed by defendant Dilts and certified pursuant to SOX by defendants Owen and Dilts. The 1Q23 Form 10-Q provided the same financial results reported in the 1Q23 press release. The 1Q23 Form 10-Q further stated that "[g]ross profit, as a percentage of net sales, was 31.6% in the 2023 period ... an increase of 34 basis points." Discussing Dollar General's purported "effective[] manage[ment]" of its inventory, the 1Q23 Form 10-Q stated that the "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

154. The statements referenced above were improper when made because they failed to disclose and misrepresented the following material, adverse facts to investors, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that: (i) Dollar General stores were chronically understaffed and suffering from logistical and inventory management problems which left stores with tens of millions of dollars' worth of outdated and unwanted inventory, mispriced goods, and lost and damaged items; (ii) that large backlogs of unsellable merchandise had built up at Dollar General's stores, which inventory had not been

timely written down due to understaffing and the Company's failure to manage its inventory; (iii) that the allotment of employee hours per store per week imposed by Dollar General management placed employees in virtually impossible situations where assigned tasks, including those necessary to effective store operations, could not be completed within the allotted time; (iv) that Dollar General was systematically overcharging customers for items upon checkout above the listed price in violation of state laws, including state law violations identified by state regulators in Arizona, Louisiana, Mississippi, Missouri, North Carolina, and Ohio; (v) that Dollar General's reported revenue and earnings were artificially inflated by defendants' overpricing scheme; (vi) that Dollar General's failure to manage store inventories and accurately price items upon checkout risked the loss of customers, lower sales, adverse regulatory actions, and reputational fallout; (vii) that Dollar General was not on track to achieve its already reduced FY23 guidance provided to investors of 3.5% to 5% net sales growth, 1% to 2% same-store sales growth, or flat diluted EPS growth to an 8% diluted EPS decline, and was suffering flatlining same-store sales growth for the year and on track to experience double-digit diluted EPS declines; and (viii) that as a result of the foregoing, the defendants' statements about Dollar General's business metrics, operations, and financial prospects were materially false and misleading when made.

155. Then, on August 31, 2023, Dollar General reported dismal 2Q23 financial results and once again slashed its sales and profit outlook for FY23, this time blaming weaker consumer spending on nonessential purchases and increasing theft. For the quarter, Dollar General revealed that its same-store sales had decreased 0.1%, operating profits had decreased 24.2%, and EPS had decreased 28.5%. The press release stated that Dollar General was on track to achieve net sales growth of only 1.3% to 3.3% for the year, compared to the prior guidance of 3.5% to 5% annual net sales growth; same-store sales growth of 1% to a 1% decline for the year, compared to the prior

guidance of 1% to 2% annual same-store sales growth. The press release also revealed that Dollar General was on track to suffer a stunning decline in diluted EPS of 34% to 22% for the year, compared to the prior guidance of flat diluted EPS growth to an 8% decline. Further, Dollar General conceded that the Company was then "taking certain actions to accelerate the pace of its inventory reduction efforts and making additional investments in targeted areas, such as retail labor, to further elevate the in-store experience and better serve its customers" and "expect[ed] an incremental operating profit headwind of up to $170 million in the second half of 2023 from these strategic actions and investments." This amount included $95 million for markdowns taken on backlogged inventory and $75 million on increased spending on personnel at the stores to both identify and eliminate the inventory to be marked down and to correctly price the items remaining on store shelves.

156. On the same day, Dollar General held an earnings conference call with analysts and investors where defendant Owen acknowledged that in order to clean up its stores, Dollar General was deploying its "smart teams" to move between multiple stores to organize excess inventory. The Company deployed one team in each of its districts in the United States. The teams were part of Dollar General's $75 million that the Company added to its spending on labor to enhance store personnel and improve store appearance.

157. On this news, Dollar General's market capitalization plunged 12% over one trading day, from its closing price of $157.66 per share on August 30, 2023, to close at $138.50 per share on August 31, 2023, a decline of $19.16 per share, erasing approximately $4.2 billion in market capitalization.

158. Analysts reacted with surprise and disappointment at the results. For example, in an August 31, 2023 "Flash" report titled, "DG: It's Even Worse Than Feared; Management Materially Cuts Guidance as It Attempts Turnaround," Wells Fargo Securities stated:

> DG [Dollar General] has historically been seen as a high quality defensive name, but we see signs of deeper issues. Management exits, uncharacteristic supply chain execution issues, tangible evidence of some share loss, a ramp in pricing actions, labor hour investments, reduced pOpshelf growth, and a temporary halt of the share repo are concerning. We are not convinced DG has ripped off the band-aid with investment to fix the issue and believe consensus still needs to come down (we may not see much growth at all in 2024).

159. Also on August 31, 2023, analysts with Truist Securities reduced their price target by $24 per share to $142 per share, stating:

> While [calendar year]23 has been hard on DG (down ~45% [year-to-date]), we think it is a result of taking too much price during the pandemic (especially given the price sensitivity of their customer base) and not investing enough labor in the stores. We suspect more labor hour investments will be needed and, at the very least, seem unlikely to reverse, both helping reset the margin lower.

160. Similarly, on August 31, 2023, analysts at Deutsche Bank Securities lowered their price target by $42 per share to $157 per share in a report titled, "The Last Cut Is the Deepest," lamenting, among other things, that the "additional $95M in markdowns on nonconsumable merchandise starting in 3Q" and that "[Dollar General] handed in the worst performance thus far with 2Q EPS coming in 14% below consensus and the full-year guidance moving 25% lower at the midpoint (and now 31% below the initial outlook provided on 3/16)."

161. Also on August 31, 2023, analysts with UBS Securities lowered their price target to $181 per share, emphasizing in a client note:

> Our checks consistently indicate that DG's store standards have slipped with untidy conditions and unacceptable out of stocks. This contrasts to its historic experience where execution has been sharp. Ultimately, the dollar store business model is straightforward. Inventory arrives in the back of the store and goes out of the front door. When inventory isn't on the shelves or it's hard for a customer to get in or out of the store, the model breaks down. Now, the question is whether DG is doing

> enough to address these issues. The reality is we don't know yet. If comps improve in the next couple of quarters, the last year will soon become a distant memory. If not, the challenges will probably increase at an exponential rate.

162. In a September 5, 2023 report, an analyst with Argus Research reduced his price target on Dollar General by $70 per share to $165 per share, noting that he "[had] been surprised by the magnitude of the weakness" in the Company's performance and further cautioning:

> The company is subject to litigation, as detailed in the annual report. Barron's recently wrote that DG has been fined over $1 million for price inaccuracies, where the price a customer is charged at the cash register is higher than the price on the shelf. While the dollar amount [of the fine] isn't material, the bad publicity and the effect on the on the company's reputation are unfortunate.

163. In total, as a result of the false and misleading statements issued by defendants regarding Dollar General's purportedly effective inventory management and positive financial outlook, the Company's stock price and market capitalization were devastated over the Relevant Period. Specifically, Dollar General's stock price declined by over 46%, or $121.94 per share, from its October 28, 2022 high of $260.44 per share to its low on August 31, 2023, erasing over $27 billion in market capitalization. The Company's stock price further fell in the days that followed, to close at $101.83 per share on October 12, 2023.

164. In addition, as a result of the defendants' improper statements detailed herein, the Company is now the subject of the Securities Class Action on behalf of investors who purchased Dollar General shares at artificially inflated prices. The Securities Class Action seeks claims against Dollar General and defendants Vasos, Owen, Garratt, and Dilts in connection with the Company's improper statements detailed herein, including causes of action under sections 10(b) and 20(a) of the Exchange Act. The Securities Class Action alleges that Dollar General misled investors by failing to disclose material, adverse facts about the Company's stores suffering from inventory management problems as a result of being chronically understaffed and in dilapidated

condition; overcharging customers for items upon checkout above the listed price in violation of state laws; and the impact that the necessary remediation efforts would have on the Company's financial position.

**INSIDER SALES BY DEFENDANTS VASOS, GARRATT, AND FILI-KRUSHEL**

165. Rather than providing the market with correct information, the Insider Selling Defendants used their knowledge of Dollar General's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated. As officers and directors of Dollar General, defendants were privy to material, nonpublic information about the Company's true business health.

166. While in possession of this knowledge, defendant Vasos sold 1.3 million shares of his personally held Dollar General stock for proceeds of over $283 million.[2] Defendant Vasos' sales were timed to maximize profit from Dollar General's then artificially inflated stock price. In particular, nearly all of defendant Vasos' sales, except for one, took place when the Company's stock price traded at or near record highs and before the truth was revealed. Defendant Vasos' sales are also suspicious given that they were his first sales in over three years. Further adding to the suspicious timing of his sales, defendant Vasos' stock sales represented nearly 80% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 903,238 |
| Shares Sold During the Sales Period ("SP") | 1,322,681 |
| Shares Disposed (Other) During SP | 95,628 |
| Total Shares Held During SP | 1,676,197 |
| Shares Remaining SP | 257,888 |
| **Total Proceeds from Sales** | **$283,571,252.76** |
| **% of Total Ownership Sold During SP** | **78.91%** |

[2] Plaintiff did not include in his analysis stock tendered to Dollar General to satisfy tax withholding obligations incurred in connection with the vesting of performance share units.

167. While in possession of this knowledge, defendant Garratt sold 174,674 shares of his personally held Dollar General stock for proceeds of nearly $35 million. Defendant Garratt's sales were timed to maximize profit from Dollar General's then artificially inflated stock price. In particular, nearly all of defendant Garratt's sales, except for two sales that occurred shortly after his resignation from the Company on June 2, 2023, took place when the Company's stock price traded at or near record highs and before the truth was revealed. Defendant Garratt's sales are also suspicious given that they were his first sales in over three years. Further adding to the suspicious timing of his sales, defendant Garratt's stock sales represented nearly 57% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 131,160 |
| Shares Sold During SP | 174,674 |
| Shares Disposed (Other) During SP | 16,524 |
| Total Shares Held During SP | 306,489 |
| Shares Remaining SP | 115,291 |
| **Total Proceeds from Sales** | **$34,981,524.67** |
| **% of Total Ownership Sold During SP** | **56.99%** |

168. While in possession of this knowledge, defendant Fili-Krushel sold 6,165 shares of her personally held Dollar General stock for proceeds of over $1.3 million. Defendant Fili-Krushel's sales were timed to maximize profit from Dollar General's then artificially inflated stock price. In particular, all of defendant Fili-Krushel's sales took place when the Company's stock price traded at or near record highs and before the truth was revealed. Defendant Fili-Krushel's sales are also suspicious given that they were her first sales in over three years. Further adding to the suspicious timing of her sales, defendant Fili-Krushel's stock sales represented 20% of her holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 27,707 |
| Shares Sold During SP | 6,165 |
| Shares Disposed (Other) During SP | 2 |
| Total Shares Held During SP | 30,582 |
| Shares Remaining SP | 24,415 |

| | |
|---|---|
| **Total Proceeds from Sales** | **$1,366,744.90** |
| **% of Total Ownership Sold During SP** | **20.16%** |

169. In sum, defendants Vasos, Garratt, and Fili-Krushel sold over $319 million worth of stock at artificially inflated prices as detailed by the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **VASOS**<br>**Current CEO and Director** | 5/29/2020 | 165,224 | $191.10 | $31,574,289.88 |
| | 5/29/2020 | 300 | $192.01 | $57,603.51 |
| | 9/1/2020 | 157,263 | $200.29 | $31,497,655.85 |
| | 9/1/2020 | 3,500 | $202.17 | $707,590.10 |
| | 9/2/2020 | 37,237 | $200.07 | $7,449,920.94 |
| | 5/28/2021 | 160,956 | $202.90 | $32,658,664.51 |
| | 5/28/2021 | 65,875 | $203.62 | $13,413,414.80 |
| | 5/28/2021 | 25,763 | $204.62 | $5,271,730.69 |
| | 5/28/2021 | 2,600 | $205.33 | $533,846.56 |
| | 12/3/2021 | 16,155 | $216.45 | $3,496,668.98 |
| | 12/3/2021 | 46,319 | $217.44 | $10,071,714.53 |
| | 12/3/2021 | 3,377 | $218.22 | $736,929.28 |
| | 12/3/2021 | 13,477 | $219.72 | $2,961,117.92 |
| | 12/3/2021 | 38,682 | $220.61 | $8,533,519.97 |
| | 12/3/2021 | 102,828 | $221.70 | $22,797,060.15 |
| | 12/3/2021 | 85,389 | $222.43 | $18,993,382.67 |
| | 12/3/2021 | 31,229 | $223.40 | $6,976,711.62 |
| | 8/26/2022 | 70,109 | $240.29 | $16,846,751.01 |
| | 8/26/2022 | 12,052 | $241.45 | $2,910,008.43 |
| | 8/26/2022 | 14,557 | $242.68 | $3,532,707.32 |
| | 8/26/2022 | 10,709 | $243.40 | $2,606,596.30 |
| | 8/26/2022 | 1,110 | $244.14 | $271,000.62 |
| | 8/29/2022 | 108,145 | $239.18 | $25,866,499.61 |
| | 8/30/2022 | 25,239 | $239.02 | $6,032,499.59 |
| | 9/1/2022 | 929 | $239.33 | $222,337.11 |
| | 9/1/2022 | 14,595 | $240.70 | $3,512,947.90 |
| | 9/1/2022 | 62,848 | $241.57 | $15,182,166.22 |
| | 9/1/2022 | 18,887 | $242.23 | $4,575,030.12 |
| | 6/6/2023 | 27,327 | $156.65 | $4,280,886.59 |
| | **Total:** | **1,322,681** | | **$283,571,252.76** |
| | | | | |
| **GARRATT**<br>**Former President and CFO** | 5/29/2020 | 38,332 | $187.74 | $7,196,514.84 |
| | 5/29/2020 | 6,668 | $188.66 | $1,257,978.21 |
| | 9/1/2020 | 6,454 | $200.88 | $1,296,486.62 |
| | 9/1/2020 | 2,105 | $202.02 | $425,258.20 |
| | 9/1/2020 | 200 | $203.04 | $40,608.24 |
| | 3/23/2021 | 20,297 | $199.24 | $4,043,887.00 |
| | 3/23/2021 | 5,830 | $199.75 | $1,164,538.42 |
| | 5/28/2021 | 30,311 | $205.05 | $6,215,176.59 |

| | | | | |
|---|---|---|---|---|
| | 12/3/2021 | 23,112 | $223.20 | $5,158,503.64 |
| | 12/3/2021 | 6,300 | $223.70 | $1,409,296.77 |
| | 8/26/2022 | 4,807 | $244.90 | $1,177,240.07 |
| | 8/26/2022 | 2,693 | $238.02 | $640,981.40 |
| | 8/29/2022 | 6,877 | $238.15 | $1,637,743.11 |
| | 6/8/2023[3] | 9,205 | $156.03 | $1,436,271.00 |
| | 6/14/2023[4] | 11,483 | $163.81 | $1,881,040.56 |
| | **Total:** | **174,674** | | **$34,981,524.67** |
| | | | | |
| **FILI-KRUSHEL Current Director** | 12/7/2021 | 876 | $222.34 | $194,768.61 |
| | 5/31/2022 | 5,289 | $221.59 | $1,171,976.29 |
| | **Total:** | **6,165** | | **$1,366,744.90** |
| | | | | |
| | | | | |
| | **Total:** | **1,503,520** | | **$319,919,522.34** |

## DAMAGES TO DOLLAR GENERAL

170. As a result of the Individual Defendants' improprieties, Dollar General disseminated improper, public statements praising the Company's inventory management and financial outlook, while failing to acknowledge the impact that Dollar General's unsafe stores and overpricing scheme would have on the Company's financial position. Further as a result of the Individual Defendants' improprieties, Dollar General's understaffed stores led to inventory management problems and unsafe working conditions that cratered the Company's earnings and exposed it to fines, penalties, legal judgments, and reputational harm. These improper statements and the Company's failure to remedy known inventory, logistical, and safety problems has

[3] Defendant Garratt's sale on June 8, 2023, was reported in a Form 144 filed the same day, following defendant Garratt's resignation from the Company on June 2, 2022. The estimated sale price per-share was calculated by dividing the gross proceeds disclosed in a Form 144 filed June 14, 2023, by the number of shares sold.

[4] Defendant Garratt's sale from June 14, 2023, was reported in a Form 144 filed the same day, following defendant Garratt's resignation from the Company on June 2, 2022. The estimated sale price per-share was calculated by dividing the aggregate market value by the number of shares sold.

devastated Dollar General's credibility as reflected by the Company's almost $27.8 billion, or nearly 48%, market capitalization loss.

171. Dollar General's performance issues and operational deficiencies also damaged its reputation within the business community and in the capital markets. In addition to price and product quality at the Company's stores, Dollar General's current and potential customers consider a company's ability to curb known abuses and implement adequate controls to ensure illegal practices are timely discovered and properly addressed. Customers are less likely to go to stores that are unsafe or engage in deceptive sales practices. Customers are also less likely to do business with companies that knowingly permit and/or encourage unscrupulous and harmful behavior, and investors are less likely to invest in companies that lack internal controls and fail to timely disclose material information. Dollar General's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

172. Further, as a direct and proximate result of the Individual Defendants' actions, Dollar General has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred to clean-up and remedy inventory management issues at Dollar General's stores;

(b) costs incurred from paying fines and penalties for OSHA violations;

(c) costs incurred from defending and paying any settlements for alleged violations of state law related to the Individual Defendants' overpricing scheme;

(d) costs incurred from defending and paying any settlement in the Securities Class Action for violations of federal securities laws; and

(e) costs incurred from compensation and benefits paid to the defendants who have breached their duties to Dollar General.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

173. Plaintiff brings this action derivatively in the right and for the benefit of Dollar General to redress injuries suffered, and to be suffered, by Dollar General as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Dollar General is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

174. Plaintiff will adequately and fairly represent the interests of Dollar General in enforcing and prosecuting its rights.

175. Plaintiff was a shareholder of Dollar General at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Dollar General shareholder.

176. The current Board of Dollar General consists of the following nine (9) directors: defendants Vasos, Calbert, Fili-Krushel, Bryant, Chadwick, McGuire, Sandler, and Santana, and non-defendant David Rowland. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Vasos, Calbert, Fili-Krushel, Bryant, Chadwick, McGuire, Sandler, and Santana Face a Substantial Likelihood of Liability for Their Misconduct**

177. The principal duty of the Board is to ensure that the Company operates in compliance with all applicable laws and regulations. Defendants Vasos, Calbert, Fili-Krushel, Bryant, Chadwick, McGuire, Sandler, and Santana face a substantial likelihood of liability for repeatedly failing to comply with this duty.

178. As detailed above, between 2012 and 2022, the Company greatly increased its footprint, aided by the Company's business model of opening "no-frills" stores with low labor costs. However, the Company limited store labor hours and staff to such an extent that it placed its employees in situations where assigned tasks such as checking out customers, stocking store shelves, and organizing inventory, could not possibly be completed within the allotted time. As a result, the Company's stores became cluttered with inventory, which led to inventory management issues, loss of merchandise, unsafe working conditions, and a string of OSHA violations.

179. The Company's inventory management issues were a direct result of its understaffed stores because there were not enough employees to organize the Company's inventory. As members of the Board, defendants Vasos, Calbert, Fili-Krushel, Bryant, Chadwick, McGuire, Sandler, and Santana knew that efficient inventory management was critical to the success of the Company. For example, since at least May 28, 2020, the Company has acknowledged in its Quarterly Reports filed on Forms 10-Q with the SEC that "[e]fficient management of our inventory has been and continues to be an area of focus for us" as "[o]n an ongoing basis, we closely monitor and manage our inventory balances."

180. The string of OSHA violations were also a result of the Company's understaffed and cluttered stores because the Company's stockrooms were commonly full with boxes of merchandise stacked dangerously high, which led to inventory being placed in store aisles in

rolltainers, which among other things, obstructed exits in violation of OSHA standards. Since 2014, OSHA has issued more than $23 million in fines and cited the Company for numerous willful, repeat, and serious workplace safety violations at its stores. By October 2022, OSHA added Dollar General to its list of "severe violators." Dollar General failed to take meaningful action until on or around August 31, 2023, when the Company announced it would be investing in incremental store labor hours and would be deploying "smart teams" to move between multiple stores to organize excess inventory. Thus, defendants Vasos, Calbert, Fili-Krushel, Bryant, Chadwick, McGuire, Sandler, and Santana ignored or failed to act on the numerous red flags that the Company was repeatedly failing to comply with federal workplace safety regulations under OSHA.

181. Further, defendants Vasos, Calbert, Fili-Krushel, Bryant, Chadwick, McGuire, Sandler, and Santana failed to address the Company's overpricing scheme. Ohio, Arizona, Louisiana, Mississippi, and North Carolina have all fined or sued Dollar General for pricing irregularities in 2021 and 2022. In particular, and as revealed in a November 2022 lawsuit against the Company by Ohio's Attorney General, Dollar General had been systematically overcharging its customers at the register for items that were marked at much lower prices on the shelf. Despite the numerous lawsuits, it was not until February 2023 that Dollar General agreed to correct all prices at the register and to cease its overpricing scheme. Thus, since at least 2021, defendants Vasos, Calbert, Fili-Krushel, Bryant, Chadwick, McGuire, Sandler, and Santana ignored red flags that its stores were routinely over-charging the Company's customers in violation of state law.

182. Therefore, demand is excused as to defendants Vasos, Calbert, Fili-Krushel, Bryant, Chadwick, McGuire, Sandler, and Santana.

**Additional Reasons Why Demand on Defendant Vasos Is Futile**

183. As alleged above, defendant Vasos breached his fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding the Company's purportedly effective inventory management and positive financial outlook, while failing to acknowledge the impact that Dollar General's unsafe stores and overpricing scheme would have on the Company's financial position.

184. Defendant Vasos also sold Dollar General stock under highly suspicious circumstances. Defendant Vasos as Dollar General's CEO and a director, possessed material, nonpublic Company information and used that information to benefit himself. Defendant Vasos sold stock based on this knowledge of material, nonpublic Company information regarding the Company's unsafe stores, inventory management issues, and overpricing scheme, and the impending decrease in the value of his holdings of Dollar General. Accordingly, defendant Vasos faces a substantial likelihood of liability for breach of his fiduciary duty of loyalty. Any demand upon defendant Vasos is futile.

185. Further, the principal professional occupation of defendant Vasos is his employment with Dollar General, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above. Accordingly, defendant Vasos lacks independence from defendants Calbert, Fili-Krushel, Bryant, Chadwick, McGuire, Sandler, and Santana, and non-defendant David Rowland due to his interest in maintaining his executive position at Dollar General. This lack of independence renders defendant Vasos incapable of impartially considering a demand to commence and vigorously prosecute this action. Dollar General paid defendant Vasos the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2022 | $1,391,720 | $5,592,354 | $5,924,983 | $2,520,000 | $192,349 | $15,621,406 |
| 2021 | $1,350,052 | $5,179,592 | $5,239,005 | $4,544,529 | $305,695 | $16,618,873 |
| 2020 | $1,341,718 | $4,403,178 | $4,544,937 | $6,075,000 | $87,990 | $16,452,823 |

Accordingly, defendant Vasos is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is futile as to defendant Vasos.

**Additional Reasons Why Demand on Defendants Bryant, Chadwick, and Sandler Is Futile**

186. Defendants Bryant, Chadwick, and Sandler, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance, and failed to ensure the Company operated in compliance with all applicable laws and regulations. The Audit Committee's Charter provides that it is responsible for overseeing "the integrity of the Company's financial statements," and "the Company's compliance with legal and regulatory requirements." Defendants Bryant, Chadwick, and Sandler were responsible for knowingly or recklessly allowing the improper statements related to the Company's purportedly effective inventory management, financial outlook, earnings guidance, and financial and disclosure controls. Indeed, defendants Bryant, Chadwick, and Sandler reviewed and approved the improper press releases made to the public, and caused these improper statements. In addition, defendants Bryant, Chadwick, and Sandler were responsible for failing to remedy the Company's unsafe stores to ensure the Company was not repeatedly violating OSHA standards, and for failing to ensure the Company did not violate state laws by implementing and/or failing to remedy the overpricing scheme. Accordingly, defendants Bryant, Chadwick, and Sandler breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein. Thus, defendants Bryant, Chadwick, and Sandler

face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

**An Additional Reason Why Demand on Defendant Fili-Krushel Is Futile**

187. Defendant Fili-Krushel sold Dollar General stock under highly suspicious circumstances. Defendant Fili-Krushel as a director and Chair of Dollar General's Compensation and Human Capital Management Committee, possessed material, nonpublic Company information and used that information to benefit herself. Defendant Fili-Krushel sold stock based on this knowledge of material, nonpublic Company information regarding the Company's unsafe stores, inventory management issues, and overpricing scheme, and the impending decrease in the value of her holdings of Dollar General. Accordingly, defendant Fili-Krushel faces a substantial likelihood of liability for breach of her fiduciary duty of loyalty. Any demand upon defendant Fili-Krushel is futile.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

188. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

189. The Individual Defendants owed and owe Dollar General fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Dollar General the highest obligation of care and loyalty.

190. The Individual Defendants and each of them, violated and breached their fiduciary duties.

191. The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration. The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) Dollar

General stores were understaffed, unsafe, and suffering from severe inventory management issues; (ii) that due to the unsafe conditions at a number of Dollar General stores the Company had been labeled a "severe violator" of OSHA standards for its numerous willful, repeat, and serious workplace violations; (iii) the Company had been systematically overcharging its customers at the register for items that were marked at much lower prices on the shelf, in violation of state laws; and (iv) the Company failed to maintain adequate disclosure controls and procedures with respect to Dollar General's operations. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

192. The Director Defendants, as directors of the Company, owed Dollar General the highest duty of loyalty. These defendants breached their duty of loyalty by recklessly permitting the improper activity concerning the Company's systematic and pervasive unlawful wrongdoing described herein. The Director Defendants knew or were reckless in not knowing that: (i) Dollar General stores were understaffed, unsafe, and suffering from severe inventory management issues; (ii) that due to the unsafe conditions at a number of Dollar General stores the Company had been labeled a "severe violator" of OSHA standards for its numerous willful, repeat, and serious workplace violations; (iii) the Company had been systematically overcharging its customers at the register for items that were marked at much lower prices on the shelf, in violation of state laws; and (iv) the Company failed to maintain adequate disclosure controls and procedures with respect to Dollar General's operations. Accordingly, these defendants breached their duty of loyalty to the Company.

193. The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and

omissions. Further, the Audit Committee Defendants breached their fiduciary duty of loyalty by failing to ensure the Company operated in compliance with all applicable laws and regulations. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

194. The Insider Selling Defendants breached their duty of loyalty by selling Dollar General stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's shareholders. The information described above was material, nonpublic information concerning the Company's future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Dollar General common stock.

195. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Dollar General has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

196. Plaintiff, on behalf of Dollar General, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

197. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

198. The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Dollar General's disclosure controls and procedures, and by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by the allowing the Company to engage in an illegal, unethical, and improper

course of conduct, which was continuous, connected, and ongoing throughout the relevant period. The Company's understaffed and unsafe stores that were suffering from inventory management issues, violating OSHA workplace safety standards, and overcharging customers at the register in violation of state laws resulted in continuous, connected, and ongoing harm to the Company.

199. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty; and (ii) incurring millions of dollars in legal liability and/or legal costs to defend the Individual Defendants' unlawful actions, including defending the Company and its officers against the Securities Class Action.

200. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

201. Plaintiff, on behalf of Dollar General, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

202. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

203. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Dollar General. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Dollar General.

204. The Insider Selling Defendants sold Dollar General stock while in possession of material, nonpublic information that artificially inflated the price of Dollar General stock. As a

result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

205. Plaintiff, as a shareholder and representative of Dollar General, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

206. Plaintiff, on behalf of Dollar General, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Dollar General, demands judgment as follows:

A. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B. Declaring that the Individual Defendants have breached their fiduciary duties to Dollar General;

C. Directing Dollar General to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Dollar General and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

2. proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

3. a proposal to strengthen the Company's controls over financial reporting and disclosure controls;

4. a proposal to strengthen Dollar General's oversight of its disclosure procedures;

5. a provision to permit the shareholders of Dollar General to nominate at least three candidates for election to the Board; and

6. a provision to control insider selling.

D. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Dollar General has an effective remedy;

E. Awarding to Dollar General restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

F. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 29, 2024

HERZFELD SUETHOLZ GASTEL LENISKI and WALL PLLC

*/s/ Joe P. Leniski, Jr.*

JOE P. LENISKI, JR. (BPR No. 22891)
TRICIA HERZFELD (BPR No. 26014)
223 Rosa L. Parks Avenue, Suite 300
Nashville, TN 37203
Telephone: (615) 800-6225
Facsimile: (615) 994-8625
E-mail: joey@hsglawgroup.com
tricia@hsglawgroup.com

ROBBINS LLP
BRIAN J. ROBBINS*
STEPHEN J. ODDO*
ERIC M. CARRINO*
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
soddo@robbinsllp.com
ecarrino@robbinsllp.com

**PHV Application Pending*

*Attorneys for Plaintiff*